UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| TROY THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:06-cv-00063 (EGS) |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT DISTRICT OF COLUMBIA'S
MOTION FOR SUMMARY JUDGMENT**

Defendant District of Columbia, by and through counsel, pursuant to Fed. R. Civ. P. 56

(b), hereby moves this court to enter judgment in its favor on all claims.   In support of this

motion the District states:

1.    Plaintiff's claims under the DC Human Rights Act are barred by the one-year statute of
      limitations.

2.    Plaintiff has failed to comply with mandatory notice requirements of DC Code §12-309.

3.    Plaintiff will not be able to establish a *prima facia* case for retaliation.

4.    Plaintiff will not be able to establish that the District's non-discriminatory and non-
      retaliatory reasons for his termination are pretextual.

A Memorandum of Points and Authorities in support of this Motion is attached hereto.

Supporting exhibits and a proposed Order also are attached.

Because this is a dispositive motion, no request for plaintiff's consent is required under

Local Rule 7.1(m).

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the
District of Columbia

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Nicole L. Lynch/s/
NICOLE L. LYNCH [471953]
Chief Civil Litigation Division Section II

/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TROY THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  Case No. 1:06-cv-00063 (EGS) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA' S
MOTION FOR SUMMARY JUDGMENT**

Defendant District of Columbia ("the District), by and through the Office of the Attorney

General, and pursuant to Federal Rule of Civil Procedure 56 (b), respectfully moves this

Honorable Court to grant summary judgment in its favor on all claims.

**STATEMENT OF THE CASE**

This is an employment discrimination and retaliation case arising out of plaintiff's

termination as a recruit officer with the District's Metropolitan Police Department (MPD).

Plaintiff alleges that he was terminated because of his gender (male) and race (Black).

According to plaintiff, by terminating him the MPD treated him differently than women and non-

Black recruit officers.  Plaintiff also alleges that he was terminated in retaliation for engaging in

protected activity.   According to plaintiff, he was terminated in retaliation for speaking out

about alleged harassment of female recruit officers by superiors at the training academy.

3

Plaintiff brings his complaint against the District pursuant to Title VII, 42 U.S.C § 2000(e) *et seq*. and the DC Human Rights Act (DCHRA), D.C. Code §2-1401.01 *et seq*.

### STATEMENT OF FACTS

Plaintiff Troy Thompson was hired by the MPD as a recruit officer on August 25, 2003. (Complaint ¶ 5; Thompson Depo at 11, 34). Plaintiff was scheduled to graduate from the police academy in April 2004. (Complaint ¶ 6) Plaintiff was notified by letter dated June 30, 2004 that he would be terminated from MPD effective July 9, 2004. (Exhibit 1). Plaintiff's termination was based on the results of an investigation by MPD's Office of Internal Affair (OIA) concerning Plaintiff's arrest in Prince George's County for making threats and telephone misuse[1] and, for making "false omissions" about drug use on Plaintiff's MPD application. (Exhibit 2).

On February 22, 2004, Linda Jameson, who claimed to have been involved in a six year relationship with Plaintiff, sought and was granted a temporary peace order against Plaintiff in the District Court of Maryland for Prince George's County. (Exhibits 4 and 5, respectively). Ms. Jameson alleged in her "Application For Statement Of Charges" that Plaintiff had physically assaulted, pulled a gun on her and threatened to kill her, threatened to harm her family and scratched her car with keys. (Exhibit 4). According to Ms. Jameson, Plaintiff repeatedly called her house and demanded that she call him at least twice per days. *Id.*

Plaintiff admits that he was arrested on charges of violating a peace order and criminal phone harassment. (Exhibit 3; Thompson Depo at 66, 69). Plaintiff admits that he knows Ms. Jameson who went by the name "Icy." (Thompson Depo at 60, 61, 66). Plaintiff denies making any threats against Ms. Jameson but admits that he does own a gun. (Thompson Depo at 74).

---

[1] Plaintiff was on released on a $3000. 00 bond (Exhibit 10- Thompson Depo at 81-82).

According to Plaintiff, Ms. Jameson and his then current girlfriend, Latonya Torrence, made up the allegations because Ms. Torrence was mad at Plaintiff for not returning her phone calls. The case against Plaintiff was "nolle pros" on March 16, 2004. (Exhibit 2 at 3). According to Ms. Jameson, she dropped the case because of the fear that Plaintiff "put on her family." *Id.* at 4.

At the time of his arrest, Plaintiff was attending the MPD police academy. Plaintiff was placed on non-contact status while OIA conducted its investigation. (Exhibit 6.). During the course of the investigation an agent from OIA attended the court hearing in Prince George's County and reported that Ms. Jameson testified to the same facts as set forth in her "Application For Statement Of Charges" (Exhibit 2 at 2-3). On April 8, 2004, Ms. Jameson was interviewed by OIA Agent Emmanuellen Moore and gave a statement in which she detailed her relationship with Plaintiff and the threats he made against her. (Exhibit 2 at 3-4).

Plaintiff was also interviewed by OIA and he denied being involved in a relationship with Ms. Jameson and denied making threats against her or her family. (Exhibit 2 at 5-6). However, during the course of the investigation the investigator obtained an array of pictures from 2000, which showed Plaintiff standing in the living room of Ms. Jameson's mother's house. *Id.* at 8-9; (Exhibit 7).

During the OIA investigation, Agent Moore also discovered that Plaintiff had previously applied to become a police officer in Prince George's County and during the application process Plaintiff had admitted to using and selling marijuana. (Exhibit 2 at 10-11; Thompson Depo at 11-12). Plaintiff testified at his deposition that he first applied to Prince George's County to be a police officer in 2001. (Thompson Depo at 11-12). According to Plaintiff, there were questions on the application that asked if he had used and sold drugs. (Thompson Depo at 17-19). Plaintiff admitted that he answered the questions by indicating that he smoked marijuana on nine

(9) occasions and that he had sold $12,000 worth of marijuana per week. (Thompson Depo at 17-22). Plaintiff admitted that he signed his application. (Thompson Depo at 23). As a result of Plaintiff's answers to questions concerning the use and sale of illegal drug, he was disqualified and denied employment with the Prince George's County Police Department. (Exhibit 8).

When Plaintiff applied to the MPD, the application contained similar questions about drug use. (Thompson Depo at 29; Exhibit 9). On the MPD application, Personal History Statement, Plaintiff answered "no" to questions about his drug use. (Thompson Depo at 32; Exhibit 9). Agent Moore concluded that Plaintiff "falsified his MPD Personal History Statement to secure employment" with the MPD. (Exhibit 2 at 10).

At the conclusion of Agent Moore's investigation she determined that based on Plaintiff's arrest, the threats against Ms. Jameson and Plaintiff's answers to drug questions on the MPD application, Plaintiff violated MPD General Order. *Id*. at 11. Specifically, Agent Moore found that Plaintiff violated General Order 1202.1 Part 1, Section B-12 (Conduct unbecoming of an Officer); General Order 1202.1 Part 1, Section I-B-6 (Willfully and knowingly making a false statement) and General Order 1202.1 Part 1, Section B-17 (Falsification of official records). *Id*. at 11-13. Agent Moore recommended that Plaintiff be terminated from the MPD. *Id*. For these reasons Plaintiff was terminated on July 9, 2004.

Plaintiff, on the other hand, claims that he was terminated because of his gender (male) and race (Black) and, in retaliation for engaging in protected activity. (Complaint). As to race, Plaintiff claims that he was treated differently from a Caucasian male recruit officer who came to work smelling of alcohol. (Thompson Depo at 46). According to Plaintiff, the Caucasian recruit officer was made to sit in the cafeteria for the whole day. (Thompson Depo at 47-48). Plaintiff admits, however, that he has no factual evidence to support his assertion that the recruit officer

was not disciplined. (Thompson Depo at 48-49). Further, Plaintiff testified that he was treated differently because a Hispanic recruit officer was terminated for failing the physical fitness test in May 2004 but was reinstated 10 months later. (Thompson Depo at 106)

As to gender, Plaintiff claims that he was treated differently from two female recruit officers who, according to plaintiff, were not disciplined for "breaking" into a residential building on the grounds of the academy and stealing a flag. (Thompson Depo at 41). According to Plaintiff, he told his class Sergeant Damion Taylor about the incident and Sergeant Taylor "did not take police action." (Thompson Depo at 40-41). According to Plaintiff, at roll call Sergeant Taylor told the class that breaking into residential building was against regulations and would not be tolerated. (Thompson Depo at 43). According to Plaintiff, he and Sergeant Taylor had "a difference in opinion" about the female recruit officers' actions. (Thompson Depo at 40-41).

Sergeant Taylor testified about the incident involving the female recruits. Sergeant Taylor testified that although the female recruits went into a building to retrieve another recruit class' flag the female recruits did not break into the building. (Sergeant Taylor Depo. at 48). According to Sergeant Taylor, the female recruits' action was not considered breaking and entering or any type of serious misconduct. (Sergeant Taylor Depo. at 50). Further, Sergeant Taylor explained that each class has a flag and recruits try to retrieve another class' flag that is left unattended. (Sergeant Taylor Depo. at 49-50). According to Sergeant Taylor, this was a game that goes on between recruit classes to encourage responsibility (i.e., guarding their flag). (Sergeant Taylor Depo. at 49). Sergeant Taylor testified that the female recruits did not violate a MPD policy or procedure that required discipline. (Sergeant Taylor Depo. at 49).

Further, Plaintiff testified that he believes that Agent Moore discriminated against him based on his gender because she did not conduct a fair investigation by talking to more people. (Thompson Depo at 105-106, 124).

As to Plaintiff's retaliation claim for engaging in protected activity, Plaintiff relies on one incident which occurred while the recruit class was doing push-ups. According to Plaintiff, Sergeant Taylor would say to female recruits "do you know who your baby's father is?" and, to the male recruits Sergeant Taylor would say "are you sure that's the baby you conceived?" (Thompson Depo at 35-40). Plaintiff testified that there were approximately 20-25 recruits and, almost equal numbers of males and females and black and white recruits. *Id.* Plaintiff admitted that Sergeant Taylor made these comments only once. *Id.*

### STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall design of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The party moving for summary judgment bears the initial responsibility of informing the trial court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Alexis v. District of Columbia*, 44 F. Supp. 331, 337 (D.D.C. 1999); *Celotex*, 477 U.S. at 323. Material facts relate to the substantive law governing the case and are those facts which would affect the outcome of the case.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

When the moving party has carried its burden, the responsibility shifts to the nonmoving party to show that there is, in fact, a genuine issue of material fact for trial.  *Alexis*, 44 F. Supp. at 337.  The opposing party must provide "specific facts showing that there is a genuine issue for trial," and "may not rely on mere allegations or denials to prevail."  Id.  The trial court must enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.  *Celotex,* 477 U.S. at 322; see also Alexis, 44 F. Supp. at 337 ("Rule 56(c) mandates summary judgment" in this circumstance) (emphasis added).

A party may defeat a properly-supported summary judgment motion only by providing a "response, by affidavits or as otherwise provided in this Rule, [setting] forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Rule 56(e) directs that summary judgment "shall be entered against the adverse party" if that party fails to raise a genuine issue for trial.  See *Anderson* 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); see also *Celotex*, 477 U.S. at 324 ("a party who fails to make a showing sufficient to establish the existence of an element essential to establish that party's case, and on which that party will bear the burden at trial" cannot withstand a motion for summary judgment).

## ARGUMENT

### I.  Plaintiff's claims pursuant to the DC Human Rights Act are barred by the one year statute of limitation.

The limitation period for a civil action under the DC Human Rights Act (DCHRA) is one year.  *Jones v. Howard University*, 574 A.2d 1343, 1345, n.1 (D.C. App. 1990); *Bolton v.*

*Institute of International Education*, 808 A.2d 499 (D.C. App. 2002); *Brown v. National Academy of Sciences*, 844 A.2d 1113 (D.C. App. 2004).

DC Code, § 2-1403.16 (a) provided:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a right of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate…   A private cause of action pursuant to this chapter *shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act* … (emphasis added)

In order for Plaintiff to bring a cause of action under the DCHRA as a result of his termination he would have had to file suit within one year of being notified that he would be terminated. *Delaware State College v. Ricks*, 449 U.S. 250, 261-262 (1980) (the statute of limitations begin to run when plaintiff was notified that his employment would terminate a year later). In this case plaintiff was notified on July 6, 2004 that his employment with MPD as a recruit officer would be terminated effective July 9, 2004. Plaintiff was required to file suit pursuant to the DCHRA with one year beginning on July 6, 2004. Plaintiff did not file the instant action until January 13, 2006, well beyond the one year statue of limitations period as set forth in § 2-1403.16 (a). Accordingly, the District is entitled to judgment as to Plaintiff's DCHRA claims, as set forth in Counts I and II.

**II.    Plaintiff has failed to give notice to the Mayor of the District of Columbia pursuant to DC Code Section 12-309 and, therefore, the claims for alleged violation of the DCHRA.**

In Counts I and II of the complaint, plaintiff has alleged discrimination based on gender and race, in violation of the DCHRA, respectively. However, plaintiff has failed to comply with the mandatory notice requires of DC Code § 12-309 (2001 edition) and, therefore, the District is entitled to judgment.

In order to maintain any tort action against the District of Columbia for unliquidated damages, Plaintiff must satisfy the mandatory notice requirement of § 12-309.  *See, e.g.*, *Hill v. District of Columbia*, 345 A.2d 867, 869 (D.C. 1975).  In pertinent part, § 12-309 provides that:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the ... [Mayor] of the approximate time, place, cause, and circumstances of the injury or damage. A report written in writing by the metropolitan Police Department, in the regular course of duty is a sufficient notice under this section.

The primary purpose of the §12-309 notice requirement is to protect the District of Columbia against unreasonable claims and to assist it in the defense of the public interest where claims are made within the applicable statute of limitations but not so long after the event that it is difficult for the District to obtain evidence for use in the litigation that may result.  *Shehyn v. District of Columbia*, 392 A.2d 1008, 1013 (D.C. 1978); *see also Pitts v. District of Columbia,* 391 A.2d 803, 807 (D.C. 1978) (general purposes of D.C. Code §12-309 are "(1) to allow the District to investigate potential claims so that evidence may be gathered while still available, for example before the relevant sidewalk is paved over or the meter cover fixed, (2) to enable the District to correct defective conditions, thus increasing public safety, and (3) to facilitate settlement of meritorious claims and resistance of frivolous ones . . .").

The requirements of the provision are not mere technicalities.  Rather, because §12-309 departs from the common law norm of sovereign immunity by allowing suits against the District, the provision's notice requirements are a mandatory prerequisite to filing a lawsuit against the District.  *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995); *Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C. 1981); *Pitts*, 391 A.2d at 807.  Moreover, the notice requirements must be "construed narrowly against claimants," *Dunmore*, 662 A.2d at 1359, even

where a "harsh result" may occur, *Hill*, 345 A.2d at 869.  Section 12-309 applies not only to

negligent actions but, to intentional tort as wells.  *Breen v. District of Columbia*, 400 A.2d 1058

(DC App. 1979).

The notice requirements of §12-309 applies not only to negligent actions but, to

intentional tort as wells.  *Breen v. District of Columbia*, 400 A.2d 1058 (DC App. 1979);  *see*

*Beeton v. District of Columbia, et al.*, 779 A.2d 918, 925 (D.C. App. 2001) (An employee who

fails to provide the requisite notice may not successfully claim unliquidated damages relating to

her wrongful termination claim).  § 12-309 is not limited to specified torts but by its very terms

applies to any action "against the District of Columbia for unliquidated damages to person or

property."  D.C. Code §12-309.  In other words, Section 12-309 "imposes a notice requirement

on *everyone* with a tort claim against the District of Columbia." *District of Columbia v.*

*Dunmore*, 662 A.2d 1356, 1358 (D.C. 1995) (emphasis added)).  Thus, §12-309 applies to

Plaintiff's claims under the DCHRA.

At least three Superior Court Judges, interpreting D.C. law, have held that §12-309 does

in fact apply to claims brought under the DCHRA.  *Cage v. District of Columbia,* Case No. 2005

CA 000991 B (D.C. sup. Ct., decided June 19, 2007) (Beck, J.); *McFarlane v. New Leaders For*

*New Sch.*, No. 2004 CA 008506 B, at 14 (D.C. Super. Ct., decided November 10, 2005) (Canan,

J.); *Descunter v. District of Columbia*, No. 2004 CA 007214, at 5 (D.C. Super. Ct. decided

March 1, 2005) (Fisher, J.) (attached hereto as Exhibits 12, 13 and 14, respectively).

Because this Court is exercising supplemental jurisdiction over Plaintiff's DCHRA claim,

the Court is bound by the D.C. Court of Appeal's interpretation of District law in determining

whether the notice requirement of D.C. Code § 12-309 is applicable to claims brought pursuant

to the DCHRA. *See Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d

695, 704 (D. Pa. 2006) (noting that state law applies to claims considered pursuant to supplemental jurisdiction).

While the D.C. Court of Appeals has not ruled on this specific question, it is logical to conclude from the court's analysis of D.C. Code § 12-309, and its applicability to other similar provisions, that the notice requirement of § 12-309 applies to claims brought under the DCHRA. Moreover, the plain language of the DCHRA supports a finding that it is subject to the notice requirement of § 12-309. Section 12-309 requires timely notice to the District before a claimant can file suit for "unliquidated *damages* to person or property." D.C. CODE § 12-309 (2001) (emphasis added). The DCHRA provides in pertinent part: "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for *damages* and such other remedies as may be appropriate . . . ." D.C. Code § 2-1403.16 (2001) (emphasis added).

A person aggrieved by unlawful discrimination caused by another person suffers damages to his person. Such damages are analogous to damages from intentional torts, such as libel, where a claimant is harmed by the words of another. The D.C. Court of Appeals has unequivocally held that claims of intentional torts brought against the District for monetary damages are subject to the notice requirement of § 12-309. *See, e.g.*, *Breen*, 400 A.2d at 1061. Based on the same logic, § 12-309 must extend to claims under the DCHRA.

In this case, Plaintiff was notified on July 6, 2004 that he would be terminated from his probationary appointment as a recruit officer effective July 9, 2004. July 6, 2004 is the operative date for calculating when the six-month notice period began to run. *Stephenson v. American Dental Association, et al*, 789 A. 2d 1248, 1249-1252 (D.C. App. 2002) (The operative fact is not the formal termination date but, is the moment [plaintiff] learned of definite injury);

*Delaware State College v. Ricks*, 449 U.S. 250, 261-262 (1980) (the statute of limitations begin to run when plaintiff was notified that his employment would terminate a year later).   Thus, in order for Plaintiff to have satisfied the six-month mandatory notice requirement under §12-309, he was required to service his written notice on the Mayor no later than January 6, 2005.   To date Plaintiff has not given notice of his claim under as required under §12-309. (*See* Exhibit 15, Affidavit of Mia Powell Liley). Therefore, Plaintiff's claims pursuant to the DCHRA should be dismissed for failure to comply with §12-309.   Accordingly, the District is entitled to judgment on these claims.

**III.    Plaintiff will not be able to establish a *prima facia* case for retaliation nor will plaintiff be able to show that the District's non-discriminatory and non-retaliatory reasons for his termination are pretextual.**

**A.    Order and Allocation of Proof under *McDonnell-Douglas*.**

Discrimination and retaliation claims under Title VII and the DCHRA are governed by the familiar burdenshifting framework announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Paquin v. Federal National Mortgage Assoc.,* 362 U.S. App. D.C. 224, 119 F.3d 23, 27 (D.C. Cir. 1997); *Mungin v. Katten Muchin & Zavis*, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1553 (D.C. Cir. 1997) (Claims brought under …the District of Columbia Human Rights Act are analyzed in the same manner as claims arising under Title VII of the Civil Rights Act of 1964); *Broderick v. Donaldson*, 2006 U.S. App LEXIS 3248 (D.C. Cir.) (A plaintiff claiming unlawful retaliation must prove her claim under the burden-shifting framework established by *McDonnell Douglas Corporation*); *Holcomb v. Powell*, 2006 U.S. App. LEXIS 520 (D.C. Cir. 2006) (Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims).

Under the *McDonnell Douglas* framework plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). Once the Plaintiff has established a *prima facie* case, the burden then shift to the employer to articulate a legitimate, non discriminatory reason(s) for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer is able to establish nondiscriminatory reasons for its actions "the presumption of discrimination simply drops out of the picture." *Holcomb*, 2006 U.S. App. LEXIS 520 (quoting *Burke v. Gould*, 286b F.3d 513, 520 (D.C. Cir. 2002)) (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 511 (1993)) (internal quotation marks omitted). The plaintiff then must show that the reasons given by the employer are pretextual and the true reason was discriminatory. *McDonnell Douglas*, 411 U.S. at 804.

1.     The *Prima Facie C*ase.

Plaintiff alleges that he was discriminated because of his gender and race. Without conceding, but only for the purpose of this motion, the District assumes that Plaintiff will be able to establish a *prima facia* case of discrimination. To establish a prima facie case of discrimination Plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse action; and (3) the unfavorable action gives rise to an inference of discrimination. *Holcomb, supra*, 2006 U.S. App. LEXIS 520; *Teneyck v. Omni Shoreham Hotel*., 365 F.3d 1139 (D.C. Cir. 2004); *Stella v. Mineta, et al*., 284 F.3d 135 (D.C. Cir. 2002).

The District asserts that Plaintiff will not be able to establish a *prima facia* case for retaliation because he did not engage in protected activity and, therefore, the District would be entitled to judgment on this claim. For retaliation, the *prima facie* requirements are (1) he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel

action; and (3) that a causal connection existed between the two. *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 452 (D.C. Cir. 1999).

Title VII prohibits an employer from discriminating because an employee "has opposed any practice made unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Likewise, the DCHRA makes it an unlawful discriminatory practice to retaliate against a person for engaging in protected activity. DC Code §2-1402.61 (a). However, "not every complaint garners its author protection under Title VII" or the DCHRA. *Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C. Cir. 2006); *Beckwith v. Career Blazers Learning Center of Washington, D.C., Inc.* 946 F. Supp 1035 (D.D.C. 1996) (finding that employee who attended prayer meeting at the "Million Man March" did not engage in protected activity under the DCHRA because the march was not a protest against discrimination but rather a day of national atonement for black men). The D.C. Circuit explained that "[w]hile no 'magic words' are required" to mark an exchange as protected activity**,** "the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Id.*; *see also Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005) (finding that an employee's comments about absence of black employees, without attributing the absence to discrimination, were insufficient to qualify as protected activity); *Welzel v. Bernstein*, 436 F. Supp. 2d 110at 122-23 (D.D.C. 2006) (holding that employee's complaint about what she perceived to be unprofessional and abusive behavior by supervisor was not protected activity where employee did not state a belief that the conduct violated Title VII).

In this case, Plaintiff's complaint about the comments Sergeant Taylor allegedly made to his recruit class while doing push-ups does not constitute protected activity. As Plaintiff testified, his recruit class had approximately 20-25 members. There were equal numbers of males and females and blacks and whites. Sergeant Taylor made similar comments to all recruits

not just one particular protected group.  Further, Plaintiff admits that Sergeant Taylor made the alleged comments only once.  Moreover, Plaintiff, himself described his opposition to Sergeant Taylor's comments as a difference of "opinion."   Plaintiff's complaint about Sergeant Taylor's comments reflects Plaintiff's unhappiness with Sergeant Taylor's training method rather than protected activity.   Accordingly, Plaintiff will not be able to establish the protected activity element of his *prima facia* case of retaliation and, therefore, the District is entitled to judgment as a matter of law on plaintiff retaliation claim.

> **2.    Defendant's Legitimate Non-Discriminatory and Non –Retaliatory Reasons**

If plaintiff succeeds in proving the *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252-53.  Once the defendant has stated a legitimate, nondiscriminatory reason for its decision, the burden shifts again to the plaintiff to establish that the articulated reason is pretexual.  *Burdine*, 450 U.S. at 253; *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1288 (D.C. Cir. 1998).  The plaintiff must establish both that the reason is false and that discrimination was likely the real reason.  *Id.* at 1290-94.

The Supreme Court explained this test in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).  In *Reeves*, the Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.* at 148.  In other words, "it is permissible to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Id.* at 147.  But the Court also noted that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was

discriminatory." *Id.* at 148. The Court concluded that "[w]hether the judgment as a matter of law is appropriate in any case will depend on a number of factors," including "the strength of the *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Id.* at 148-49.

In adjudging an employer's explanation, the D.C. Circuit has provided the following guidance in *Fischbach v. District of Columbia Dep't of Corrections*, 318 U.S. App. D.C. 186, 86 F.3d 1180 (D.C. Cir. 1996):

> Even if a court suspects that a job applicant "was victimized by [ ] poor selection procedures" it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive**.**" *Milton v. Weinberger*, 225 U.S. App. D.C. 12, 696 F.2d 94, 100 (D.C. Cir. 1982). Once the employer has articulated a non-discriminatory explanation for its action, as did the District here, the issue is not "the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, (7th Cir. 1992); *see also Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason").
>
> Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination, *see Parker v. HUD*, 282 U.S. App. D.C. 17, 891 F.2d 316, 322 (D.C. Cir. 1989); if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so. Short of finding that the employer's stated reason was indeed a pretext, however – and here one must beware of using 20/20 hindsight--the court must respect the employer's unfettered discretion to choose among qualified candidates. *Ramey v. Bosher,* 286 U.S. App. D.C. 288, 915 F.2d 731, 735 (D.C. Cir. 1990). *See also Dale v. Chicago Tribune Co.*, 797 F2d 458, 464 (7th Cir. 1986) (district judge does not sit as "super-personnel department that reexamines an entity's business decisions").

*Id.*.

Assuming that Plaintiff can make a *prima facie* case of discrimination and retaliation relating to his termination, the Court should grant summary judgment as to these claims because Plaintiff cannot show that the District's legitimate, non-discriminatory and non-retaliatory reasons are false.   Plaintiff was terminated following an internal investigation which concluded that Plaintiff violated MPD General Order 1202.1 Part 1, Section B-12 (Conduct unbecoming of an Officer); General Order 1202.1 Part 1, Section I-B-6 (Willfully and knowingly making a false statement) and General Order 1202.1 Part 1, Section B-17 (Falsification of official records). (Exhibit 2 at 11-13).  Agent Moore recommended that Plaintiff be terminated from the MPD. (Exhibit 2 at 11).  The events that triggered the OIA's investigation were unrelated to Plaintiff's performance in the police academy but rather related to personal matter that occurred outside of the police academy.

Plaintiff's termination was based on the results of an investigation by MPD's Office of Internal Affair (OIA) concerning Plaintiff's arrest in Prince George's County for making threats and telephone misuse and, for making "false omissions" about drug use on plaintiff's MPD application.  (Exhibit 2).   On February 22, 2004, Ms Jameson, a person who plaintiff admits knowing by the name "Icy", was granted a temporary peace order against Plaintiff in the District Court of Maryland for Prince George's County.  (Exhibits 4 and 5, respectively; Thompson Depo. at 60, 61, 66).  Ms. Jameson alleged in her "Application For Statement Of Charges" that Plaintiff had physically assaulted, pulled a gun on her and threatened to kill her, threatened to harm her family and scratched her car with keys. (Exhibit 4).  According to Ms. Jameson, Plaintiff repeatedly called her house and demanded that she call him at least twice per days.  *Id.*

Plaintiff admits that he was arrested on charges of violating a peace order and criminal phone harassment.  (Exhibit 3; Thompson Depo. at 66, 69).  The arrest occurred at the time

plaintiff was attending the police academy.  Plaintiff was placed on non-contact status while OIA conducted its investigation.  (Exhibit 6.).   During the course of the investigation an agent from OIA attended the court hearing in Prince George's County and reported that Ms. Jameson testified to the same facts as set forth in her "Application For Statement Of Charges" (Exhibit 2 at 2-3).  Although plaintiff denies that he and Ms. Jameson were involved in a relationship and denies making threats against her or her family, OIA investigator was able to obtain an array of pictures from 2000, which showed Plaintiff standing in the living room of Ms. Jameson's mother's house.  (Exhibit 2 at 5-6, 8-9; Exhibit 7).   Moreover, on April 8, 2004, Ms. Jameson was interviewed by OIA Agent Emmanuellen Moore and gave a statement in which she detailed her relationship with Plaintiff and the threats he made against her.  (Exhibit 2 at 3-4).   Although the case against plaintiff was "nolle pros" on March 16, 2004, Ms. Jameson told Agent Moore that she dropped the case because of the fear that Plaintiff "put on her family."  (Exhibit 2 at 3-4).

The fact that charges against Plaintiff were nolle pros does not prohibit MPD from proceeding with the administrative disciplinary proceedings.  In *Polcover v. Secretary of the Treasury, et al*, 477 F.2d 1223 (D.C. Cir. 1973), a federal employee was indicted on bribery charges.  Administrative disciplinary proceedings were initiated against the employee who was subsequently fired.  The criminal charges were resolved in the employee's favor, and he sought reinstatement. The employee argued that he should have been reinstated because he was acquitted of the criminal charges.

The D. C. Circuit Court of Appeals rejected this argument and stated that "[t]he difference between proof to a "preponderance" of the evidence, the burden assumed by the agency in administrative proceeding of this nature, and the proof "beyond a reasonable doubt",

the burden assumed by the government in the criminal prosecution, is critical." *Id.* at 1231-32.

Further, the Court noted,

> The law does not require the proof which might lead to
> an administrative determination that removal would be for
> the best interest of the IRS be of the same quality as would be
> necessary to convince a jury beyond a reasonable doubt to
> convict in a criminal case. The jury, to be sure, had not been convinced
> beyond a reasonable doubt but the Commissioner could well have
> concluded that the evidence was substantial enough to justify a
> refusal to reinstate.

*Id.* (quoting *Finfer v. Caplin* 344 F.2d 38, 41 (2d Cir. 1965), *cert. denied*, 382 U.S. 883

(1965)).

Further, the MPD does not have to rely on the underlying charges to terminate plaintiff's

employment. An indictment, and in this case the arrest, itself can serve as a sufficient basis for

termination. *Brown v. Department of Justice and Immigration & Naturalization Service*, 715

F.2d 662, 668 ("it is not necessary for the agency to rely on evidence presented at the criminal

trial in justifying the suspension because, as we have seen, petitioners' suspension was based

upon the fact of the indictment itself and not upon the underlying alleged unlawful conduct").

The arrest of Plaintiff based on Ms. Jameson's allegation was not the only bases for

supporting the decision to terminate Plaintiff. During the course of the OIA investigation, Agent

Moore also found out that Plaintiff had previously applied to become a police officer in Prince

George's County and during the application process Plaintiff had admitted to using and selling

marijuana. (Exhibit 2 at 10-11; Thompson Depo. at 11-12). Plaintiff testified at his deposition

that when he applied to Prince George's County to be a police officer in 2001 there were

questions on the application that asked if he had used and sold drugs. (Thompson Depo. at 11-

12, 17-19). Plaintiff admitted that he answered the questions by indicating that he smoked

marijuana on nine (9) occasions and that he had sold $12,000 worth of marijuana per week.

(Thompson Depo. at 17-22).   Plaintiff admitted that he signed his application.  (Thompson Depo at 23).   As a result, Plaintiff was disqualified and denied employment with the Prince George's County Police Department.  (Exhibit 8).   When Plaintiff applied to the MPD, the application contained similar questions about drug use.  (Thompson Depo at 29; Exhibit 9).   On the MPD application, Personal History Statement, Plaintiff answered "no" to questions about his drug use. (Thompson Depo at 32; Exhibit 9).   Agent Moore concluded that Plaintiff "falsified his MPD Personal History Statement to secure employment" with the MPD. (Exhibit 2 at 10).   In addition, the OIA investigation found that Plaintiff committed conduct that was "unbecoming a police officer."

On these admitted facts, Plaintiff will not be able to establish that the District's legitimate non-discriminatory and non-retaliatory reasons for his termination are false.

## CONCLUSION

The District is entitled to judgment as matter of law because Plaintiff's DCHRA claims are barred by the statute of limitations, Plaintiff has failed to comply with the notice requirements of DC Code §12-309, Plaintiff will not be able to establish a *prima facia* case for retaliation and Plaintiff will not be able to establish that the District's legitimate non-discriminatory and non-retaliatory reasons for his termination are pretextual.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the
District of Columbia

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Nicole L. Lynch/s/
NICOLE L. LYNCH [471953]
Chief Civil Litigation Division Section II

/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TROY THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:06-cv-00063 (EGS) |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant, by and through the Office of the Attorney General, hereby, submits the

following statement of material facts as to which there is no genuine issue.

1.  Exhibit 1 is a true and accurate copy of the Letter of termination.

2.  Exhibit 2 is a true and accurate copy of Office of Internal Affairs' Final
Investigation Report.

3.  Exhibit 3 is a true and accurate copy of PG County Arrest Warrant

4.  Exhibit 4 is a true and accurate copy of Linda Jameson's Application for
Statement of Charges.

5.  Exhibit 5 is a true and accurate copy of Temporary Peace Order.

6.  Exhibit 6 is a true and accurate copy of Revocation of Police Powers Form.

7.  Exhibit 7 is a true and accurate copy of Pictures of Plaintiff.

8.  Exhibit 8 is a true and accurate copy of PG County Human Resources Record
concerning Plaintiff's Application to be a police officer in PC County.

9.  Exhibit 9 is a true and accurate copy of Plaintiff's Personal History Statement on file with Metropolitan Police Department.

10. Exhibit 10 is a true and accurate copy of relevant portions of Plaintiff's deposition transcript.

11. Exhibit 11 is a true and accurate copy of relevant portions of Sergeant Damion Taylor's deposition transcript.

12. Exhibit 12 is a true and accurate copy of Judge Ronna Beck's memorandum order in *Cage v. District of Columbia*, 2005 CA 000991 B.

13. Exhibit 13 is a true and accurate copy of Judge Russell F. Canan's memorandum order in *McFarlane v. New Leaders for New Schools, et al.,* 2004 CA 008506 B

14. Exhibit 14 is a true and accurate copy of Judge Gerald I. Fisher's memorandum order in *Descutner v. District of Columbia*, 2004 CA 007214 B

15. Exhibit 14 is the Affidavit of Mia Powell Liley.

16. Plaintiff Troy Thompson was hired by the MPD as a recruit officer on August 25, 2003 and scheduled to graduate from the police academy in April 2004. (Complaint ¶¶ 5-6; Thompson Depo at 11, 34).

17. Plaintiff was notified by letter dated June 30, 2004 that he would be terminated from MPD effective July 9, 2004.  (Exhibit 1).

18. Plaintiff's termination was based on the results of an investigation by MPD's Office of Internal Affair (OIA) concerning Plaintiff's arrest in Prince George's County by for making threats and telephone misuse and, for making "false omissions" about drug use on plaintiff's MPD application.  (Exhibit 2).

19. After being arrested Plaintiff was released on a $3000.00 bond (Exhibit 10-Thompson Depo at 81-82).

20. On February 22, 2004, Linda Jameson, who claimed to have been involved in a relationship with Plaintiff, sought and was granted a temporary peace order against Plaintiff in the District Court of Maryland for Prince George's County. (Exhibits 4 and 5, respectively).

21. Ms. Jameson alleged in her "Application For Statement Of Charges" that Plaintiff had physically assaulted, pulled a gun on her and threatened to kill her, threatened to harm her family and scratched her car with keys. (Exhibit 4).

22. Plaintiff admits that he was arrested on charges of violating a peace order and criminal phone harassment.  (Exhibit 3; Thompson Depo at 66, 69).

23.    Plaintiff admits that he knows Ms. Jameson who went by the name "Icy." (Thompson Depo at 60, 61, 66).

24.    The case against Plaintiff was "nolle pros" on March 16, 2004.  (Exhibit 2 at 3).

25.    Ms. Jameson reported that she dropped the case against Plaintiff because of the fear that Plaintiff "put on her family."  (Exhibit 2 at 4).

26.    At the time of his arrest, Plaintiff was attending the MPD police academy.

27.    Plaintiff was placed on non-contact status while OIA conducted its investigation. (Exhibit 6.).

28.    On April 8, 2004, Ms. Jameson was interviewed by OIA Agent Emmanuellen Moore and gave a statement in which she detailed her relationship with Plaintiff and the threats he made against her.  (Exhibit 2 at 3-4).

29.    During the course of the investigation, OIA obtained an array of pictures from 2000, which showed Plaintiff standing in the living room of Ms. Jameson's mother's house.  (Exhibit 2 at 8-9; Exhibit 7).

30.    During the course of the OIA investigation, Agent Moore also found out that Plaintiff had previously applied to become a police officer in Prince George's County and during the application process Plaintiff had admitted to using and selling marijuana. (Exhibit 2 at 10-11; Thompson Depo at 11-12).

31.    Plaintiff admitted that he answered the questions by indicating that he smoked marijuana on nine (9) occasions and that he had sold $12,000 worth of marijuana per week.  (Thompson Depo at 17-22).

32.    Plaintiff admitted that he signed his application.  (Thompson Depo at 23).

33.    As a result of Plaintiff's answers to questions concerning drug use and sale, he was disqualified and denied employment with the Prince George's County Police Department.  (Exhibit 8).

34.    When Plaintiff applied to the MPD, the application contained similar questions about drug use.  (Thompson Depo at 29; Exhibit 9).

35.    On the MPD application, Personal History Statement, Plaintiff answered "no" to questions about his drug use.  (Thompson Depo at 32; Exhibit 9).

36.    Agent Moore concluded that Plaintiff "falsified his MPD Personal History Statement to secure employment" with the MPD.  (Exhibit 2 at 10).

37.    At the conclusion of Agent Moore's investigation she found that based on the threats to Ms. Jameson and Plaintiff's answers to drug questions on the application, Plaintiff has violated MPD General Order.  (Exhibit 2 at 11). Specifically, Agent Moore found that Plaintiff violated General Order 1202.1 Part 1, Section B-12 (Conduct unbecoming of an Officer); General Order 1202.1 Part 1, Section I-B-6 (Willfully and knowingly making a false statement) and General Order 1202.1 Part 1, Section B-17 (Falsification of official records).  (Exhibit 2 at 11-13).

38.    Agent Moore recommended that Plaintiff be terminated from the MPD.  *Id.*

39.    Plaintiff was not disciplined for any acts relating to his attending the police academy.

40.    Plaintiff admits that he has no factual evidence to support his assertion that a Caucasian recruit officer was not disciplined.  (Thompson Depo at 48-49).

41.    Plaintiff and Sergeant Taylor had "a difference in opinion" about the female recruit officers' actions. (Thompson Depo at 40-41).

42.    Sergeant Taylor believed that the female recruits did not braking into the building. (Sergeant Taylor Depo. at 48).

43.    Each recruit class has a flag recruits try to retrieve each another class' flag that is left unattended. (Taylor Depo. at 49-50).

44.    Acquiring another recruit class' flag is a game that goes on between recruit classes to encourage responsibility.  (Taylor Depo. at 49).

45.    Sergeant Taylor believed that the female recruits did not violate a policy or procedure that required discipline.  (Sergeant Taylor Depo. at 49).

46.    There were approximately 20-25 recruits, and almost equal numbers of males and females and, black and white recruits.  *Id.*

47.    Plaintiff admitted that Sergeant Taylor made these comments only once. *Id.*


Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the
District of Columbia

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Nicole L. Lynch/s/
NICOLE L. LYNCH [471953]
Chief Civil Litigation Division Section II


/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov