# EXHIBIT 2

**METROPOLITAN POLICE DEPARTMENT**
Office of Professional Responsibility
Office of Internal Affairs

May 25, 2004

## MEMORANDUM

TO:           Assistant Chief of Police
Office of Professional Responsibility

THRU:      Director
Office of Internal Affairs

THRU:      Captain
Office of Internal Affairs

THRU:      Supervisory Lieutenant
Special Investigation Unit

SUBJECT:   Final Report and Recommendation Concerning Office of Internal
Affairs Confidential Investigation #04-38; CS #04-0311

## ALLEGATION

On Thursday, February 26, 2004, the Metropolitan Police Department (MPD),
Office of Internal Affairs (OIA) received allegations that MPD Recruit Officer
(RO) Troy A. Thompson of the Institute of Police Science (IPS) stalked Ms. Linda J.
Jamison outside her home and made numerous unwanted telephone calls to her
residence and threatened to kill her.

Additionally, Ms. Jamison alleged that RO Thompson came to her residence and
pointed a handgun at her.

During the course of this OIA investigation, unrelated allegations of misconduct
arose. Specifically, it is alleged that RO Thompson falsified his Personal History
Statement with the department regarding his drug use/sales, to gain employment
with MPD.

## INVESTIGATION

On Monday, March 1, 2004, this case was assigned to Agent Emmanuellen C. Moore
of OIA, Special Investigations Unit (SIU).

On Thursday, February 26, 2004, at approximately 0930 hours, RO Thompson reported to his officials at the IPS that the Prince George's (PGC) County Sheriff's Office in Upper Marlboro, Maryland (MD) arrested him on Wednesday, February 25, 2004, for an outstanding warrant on a criminal charge of "Telephone Misuse/Repeat Calls". RO Thompson further informed his officials that he was presented before a PGC Commissioner in Oxon Hill, MD for a bond hearing and was released on a $3,000.00 bond, and ordered to return to court on April 16, 2004. **(Attachment #1)**

RO Thompson was also served a Temporary Protection Order (TPO) #SP5-1-0457-04, that was filed on Monday, February 23, 2004, by petitioner Ms. Linda Jameson of 2309 Sheridan Street, Hyattsville, MD, at the District Court of MD for PGC, and naming RO Thompson as the Respondent.
**(Attachment #2)**

Documents show that on Sunday, February 22, 2004, Ms. Jameson filed a complaint with the District Court of MD for PGC, naming RO Thompson as the defendant and reporting that on or about February 22, 2004, RO Thompson had pointed a handgun at her and told her that he would kill her if she did not do what he said and that was to be in the house when he called.

On Tuesday, February 24, 2004, Ms. Jameson filed a TPO, identifying RO Thompson as the person, who had threatened her with violence, harassed, stalked, and destroyed her property. Ms. Jameson also noted in her statement to the court that she and RO Thompson had a romantic relationship for six years that ended two years ago, and since then RO Thompson has been stalking her, making unwanted calls to her residence, scratched her car with keys, produced a handgun and threatened to kill her. **(See Attachment #2)**

On Thursday, February 26, 2004, as a result of the charges RO Thompson was served with a P.D. 77 (Revocation/Restoration of Police Powers and Notice of Duty and Pay Status) by Sergeant (Sgt.) Daimon Taylor of IPS, and his duty status was changed to a Non-Contact Office Duty. As a result of the change to a non-contact duty status, RO Thompson's probationary period was extended indefinitely. **(Attachment #3 & 3A)**

Sgt. Taylor noted in a Preliminary Report dated February 26, 2004, that he interviewed RO Thompson and that RO Thompson denied the allegations and charges and said he did not know the complainant, Ms. Linda Jameson, and suspected that his ex-girlfriend Ms. Latonya Torrence was framing him.
**(Attachment #4)**

On Monday, March 1, 2004, a TPO hearing was held at the District Court of MD, located at 4990 Rhode Island Avenue, Hyattsville, MD. Present at the hearing to

monitor was OIA Agent Kimberly Robinson. During the hearing RO Thompson requested from the court that the case be continued because his attorney was not present. However, RO Thompson did not tell the court that he did not know Ms. Jameson. The court granted the request and continued the hearing to Monday, March 8, 2004.

On Monday, March 8, 2004, a TPO hearing was held at the District Court of MD, PGC. Present again was Agent Robinson. During the hearing the complainant, Ms. Jameson reiterated her complaint, adding that she had been a romantic relationship with RO Thompson and had been dating him since 1998. She also said that RO Thompson ordered her to telephone him twice a day to "check-in" and if not, he threatened to harm her family.

Ms. Jameson told the court that when she did not call him on February 22, 2004, RO Thompson called her residence at 0230 hours complaining that he did not hear from her that day. Ms. Jameson stated her mother (Ms. Anderson) picked up the telephone and she also heard his threats. Ms. Anderson, the mother of the complainant also testified to the court about the night of the incident. Ms. Anderson said that RO Thompson constantly called demanding to speak to her daughter (complainant), and as she and her daughter listened on the telephone RO Thompson said he was going to kill her and her family.

Ms. Jameson added that later that morning she noticed her vehicle that was parked out front of her house had been keyed (scratched). Ms. Jameson said her vehicle had scratch marks all over, which appeared to have been done with a key.

On Tuesday, March 23, 2004, RO Thompson presented a letter to IPS that he had received in the mail from the District Court of Maryland noting the final disposition of the criminal complaint filed against him. The State of Maryland "Nolle Pros" the criminal charges on March 16, 2004, because the State Attorney's had determined that the case would not be prosecuted. **(Attachment #5)**

On Thursday, April 8, 2004, this Agent interviewed the complainant, Ms. Linda Janelle Jameson at OIA. Ms. Jameson gave a taped statement detailing the relationship she had with RO Troy Thompson and how he threatened her on the telephone and in person. **(Attachment #6)**

Ms. Jameson said she began dating RO Thompson between 1998 and 1999, and that it ended in the year 2001. She met him at a nightclub in the District of Columbia named, "D.C. Live". Ms. Jameson said that when she first met RO Thompson, he was living with his mother in Fort Washington, Maryland, whom she also met by visiting him at his home on several occasions. Ms. Jameson expressed that she could not believe that during the court hearing in PGC, Maryland that he and his mother said they did not know her.

Ms. Jameson also said that at the beginning of their relationship she had major surgery at Providence Hospital in the year 2000 which did not go well, and RO Thompson and his mother persuaded her to sue the hospital. Ms. Jameson said that RO Thompson and his mother found her a lawyer whom she did acquire in Silver Spring, Maryland, and in the end she won $275,000.00.

Thereafter, Ms. Jameson said RO Thompson began to ask for expensive items and cash money. In the beginning she gave him $20,000.00 in cash, and then two months later $5,000.00 in cash.

Ms. Jameson said she began to notice that RO Thompson was becoming controlling and began to stalk her. At that time, she was living in Takoma Park, MD by herself. She said RO Thompson did not want her to date anyone or go anywhere and kept asking for more money. She eventually told him a lie, and said she gave the rest of the money to her brother who put it in the bank. Ms. Jameson said that is when RO Thompson began to stalk her, so she broke off the relationship. RO Thompson continued to call and demanded that she had to call him everyday and check in with him. Ms. Jameson said she did it for a while but stopped and that is when she came home one night with her cousin Heather Estrada (resides in Jamaica) and found him hiding behind a tree. RO Thompson approached her and wanted to know where she had been. Ms. Jameson said RO Thompson hit her with his fist in her nose and her cousin fled the scene in fear. Ms. Jameson said her cousin was only there for a visit.

Ms. Jameson said she filed the complaint, against RO Thompson on February 23, 2004, because he called her where she now lives with her mother in the middle of the night. Her mother answered and RO Thompson demanded to speak to her. Her mother told him not to call anymore and she hung up. RO Thompson called again. Ms. Jameson said that is when they contacted the police department who came out to their house. When the police got there Ms. Jameson said RO Thompson called again and they handed the telephone to the officer who heard RO Thompson threatening her on the telephone.

Ms. Jameson again said she just could not believe that he and his mother told the court that they did not know her. Ms. Jamison said, "He made me look like an idiot in court." Therefore, Ms. Jameson said she and her mother decided to drop the case because of the fear that he has put on her family.

At the end of the interview Ms. Jameson expressed that she did not want MPD to continue the investigation in fear of her life and said she would be leaving to relocate out of the country to her home in Jamaica.

Even though, RO Thompson testified at the P.G. Court hearing that he did not know Ms. Jameson, she was able during the interview to name two (2) places of

employment that RO Thompson had listed on his "Personnel History Book" for employment with MPD.

On Tuesday, May 4, 2004, RO Thompson was interviewed. RO Thompson denied personally knowing the complainant Ms. Jameson and said that he had met her on two occasions through his girlfriend Miss. LaTanya Torrence. He said the first time was at the Pentagon Mall in 2001, and the other time was at Iverson Mall in Maryland, which was months later. RO Thompson also said that on each occasion it was a brief hello by an introduction of his girlfriend Ms. Torrence, but no conversation. **(Attachment #7)**

RO Thompson said that after he was charged with the TPO and released he contacted his girlfriend Ms. Torrence and read her the complaint over the telephone, because he did not know who Ms. Jameson was by name. He said after reading it to her, Ms. Torrence said it was Ms. Jameson, who was a friend of hers.

RO Thompson said that after he was initially charged, he appeared in court on March 8, 2004, to answer to the charges. RO Thompson said that he testified to the court that he did not know Ms. Jameson and had no relationship with her as she had testified. RO Thompson said that he introduced to the court, Ms. Torrence who he said told the court that she had met Ms. Jameson on the internet chat room about five or six years ago.

When RO Thompson was asked if he testified that he identified Ms. Torrence as his girlfriend, he stated that he did not. However, Agent Robinson of OIA was present during the court hearing and reported on a P.D. 854 that RO Thompson had testified to the Judge that Ms. LaTonya Torrence was his present girlfriend and emphatically said Ms. Jameson was not. **(Attachment #8)**

RO Thompson stated to this Agent that he and Ms. Torrence had been dating from 1996 to somewhere at the end of 2003 or beginning 2004, but that when he was charged with the TPO order they were no longer dating.

RO Thompson was asked if he owned a weapon and he replied that he did. RO Thompson was asked if he pointed a handgun at the complainant Ms. Jameson, and he replied that he did not.

RO Thompson was asked by OIA if he threatened to kill Ms. Jameson and her family, and he replied that he did not.

RO Thompson was asked if he had telephoned Ms. Jameson's residence threatening to kill on the night of February 22, 2004, and he replied that he did not.

RO Thompson also denied that he had identified to the court that Ms. LaTonya Torrence was his girlfriend, and continued to say that he did not know the

complainant, Ms. Jameson and there was no romantic relationship as she had stated.

On Wednesday, May 5, 2004, this Agent met up with Ms. Torrence in Montgomery County, Maryland. Ms. Torrence was hostile and emotional when asked to talk about her court testimony and her relationship with the complainant, Ms. Jameson. Ms. Torrence spoke about Ms. Jameson in a monotone voice, reiterating that she met Ms. Jameson on the internet at a website called the "Black Planet", and they went out a couple of times together. Ms. Torrence also said that she believes Ms Jameson was interested in having an affair with her, but she would not elaborate.

Ms. Torrence became agitated when asked why she testified in court and identified herself as RO Thompson's girlfriend in court. She went back and forth on the question trying to describe the relationship between her and RO Thompson, and finally saying she does not recall the last time they were together. Ms. Torrence could not even name where RO Thompson worked prior to coming on the department and became very angry when asked if she knew if he graduated from the police academy yet. She actually did not know.

On May 6, 2004, the PGC Communications Division provided this Agent with documents which show dispatched calls for police service to the complainant, Ms. Jameson's home in Hyattsville, MD. Evidence show that on February 22, 2004, at 0328 hours a call for police service was made from the complainants home at 2309 Sheridan Street, Hyattsville, MD for "harassing telephone calls". Police responded and advised Ms. Jameson on how to track the telephone calls for investigation with the telephone company. Later, a second call was made on the same date at 0729 hours to the same address for "Vandalism to Auto", in which an incident report #04-053-294 was made by the county on Ms. Jameson's vehicle. Ms. Jameson's car had been scratched by what appeared to be keys. **(Attachment #9)**

Additionally, RO Thompson testified before the court that he did not know Ms. Jameson and that she was not his girlfriend, and to prove it he brought Ms. Torrence to court and testified that she was his girlfriend. However, when asked by this Agent about his testimony of his relationship with Ms. Torrence during the court proceedings, RO Thompson said Ms. Torrence was not his girlfriend, and he does not recall testifying to it in court. RO Thompson also does not know where Ms. Torrence is employed, even though he said they have dated since 1996-97 to early 2004.

On Thursday, May 6, 2004, this Agent obtained from Ms. Drucille Anderson, mother of Ms. Jameson a "Verizon" telephone bill #(301) 559-4941. The bill showed nine (9) telephone calls that were dialed at her house on February 22, 2004, between the hours of 3:33 A.M and 3:54 A.M, and were identified as "Call Trace". Call Trace is used to identify unwanted telephone numbers that are dialed to a Verizon customer's number. The call is traced and investigated by Verizon when the

customer dials *57 after each call. This Verizon bill also reflects with the PGC's Communications report for harassing telephone calls. **(Attachment #10)**

Furthermore, when Ms. Torrence was asked when she first heard from RO Thompson about the warrant and TPO, she said that RO Thompson said he contacted her from jail and told her the story.

Ms. Torrence also said that she offered to help RO Thompson and said she would testify if he needed her, and that he took her to his lawyer where they all sat in his office to discuss the matter. However, RO Thompson said that when he took Ms. Torrence to his lawyer, she sat in the office alone with his lawyer while he waited outside.

On Friday, May 7, 2004, this Agent contacted the PGC Recruitment Office to inquire about the application that RO Thompson had noted in his MPD Personal History Statement seeking employment as a police officer. Investigator (Inv.) Lester Suydan retrieved RO Thompson's "Preliminary Questionnaire" which consists of twelve pages asking basic questions to meet the minimal requirements to continue the investigation and background. Inv. Suydan noted that RO Thompson had applied to the PGCPD on October 6, 2000, in which his application was disqualified for the following reasons:

> ➢ Dismissed "Stet Docket" in PGC
> ➢ Used Marijuana nine (9) times
> ➢ Last used marijuana, December 1996
> ➢ Participation of Illegal Drugs…Sold Marijuana from 1995-96 in the amount of $12,000.00

Inv. Suydan added that RO Thompson reapplied to the PGCPD in May 2002 and this time was disqualified permanently because he denied *any drug* use.

However, RO Thompson had noted in his MPD Personal History Statement, dated January 7, 2003, on page 24 which ask the following questions: **(Attachment #11)**

Do you now or have you in the past, used, tried, or experimented with:

|   |   |   |   |
|---|---|---|---|
| A. | Marijuana (in any of its forms)? | Answer: | No |
| B. | Narcotics of any kind? | Answer: | No |
| C. | Dangerous drugs of any kind? | Answer: | No |
| D. | Any illegal drug? | Answer: | No |

On Tuesday, May 11, 2004, an attempt to contact Ms. Jameson was unsuccessful. Ms. Jameson's mother Ms. Anderson said her daughter had left on April 18, 2004, and now lives in Trinidad and is getting married in June. She added that her daughter was in fear for her life from RO Thompson and did not want to put her family here in danger.

On Wednesday, May 19, 2004, this Agent responded to the Prince George's County Police Department, Recruiting Unit in Prince George's County, Maryland and met with investigator (Inv.) Lester Suydan. Inv. Suydan produced two folders that showed RO Thompson had applied to the PGCPD twice, once in 2000 and again in 2002, and was disqualified each time. **(Attachment #11A)**

Evidence showed that RO Thompson wrote on the PGCPD Preliminary Questionnaire, dated October 6, 2000, that he used marijuana nine (9) times from 1995- through 1996, participated in selling marijuana during school in the amount of $12,000.00 and was present when a friend transported marijuana. RO Thompson was disqualified because he participated in illegal drugs.

RO Thompson then reapplied with the PGCPD on May 10, 2002, and again answered to questions on the Preliminary Questionnaire Booklet. RO Thompson denied any drug use on the questionnaire and was *permanently* denied.

On Thursday, May 20, 2004, RO Thompson was re-interviewed (addendum) by this Agent and asked to explain the discrepancies in his application with the PGCPD and MPD in reference to the use illegal drugs, specifically marijuana. **(Attachment #12)**

RO Thompson said he applied with the PGCPD four times beginning in 2001, and admitted the marijuana use one time on each application. RO Thompson said he chose not to indicate marijuana use on his MPD Personal History Statement because he did not smoke the marijuana but was put in a position whereas a friend was smoking it and blew the marijuana smoke into his (RO Thompson) mouth making him inhale it.

However, when asked did he indicate when applying for employment with the PGCPD that he used marijuana nine times, he replied that he did.

When asked if he indicated when applying with the PGCPD that he sold about a pound of marijuana on school property in 1995, 1996 worth $12,000.00, RO Thompson replied that he did.

When asked when he applied for employment with PGCPD that he indicated that he was in the company of a friend who transported drugs, RO Thompson replied that he did. RO Thompson said that he was with a friend who sold drugs over 40 times, but he was not a lookout, just a "stand-by" for the friend. RO Thompson added that he would stand around in case the police came around.

On June 2, 2004, Agent Kimberly Robinson of OIA obtained a colored photograph of RO Troy Thompson from the complainant's mother, Mrs. Anderson. The photograph is dated processed on May 5, 2000, and shows an array of 25 different photos on one sheet of paper. Mrs. Anderson pointed to and indicated that #20 and #21 was RO Thompson. Agent Robinson and this Agent also identified the photo as being RO Thompson. Additionally, this Agent recognizes the background scene of

the two photos because of the recent visit to Mrs. Anderson's home on May 6, 2004, which shows the background scene of the living room.  **(Attachment #13)**

## FINDINGS

On Thursday, February 26, 2004, Recruit Officer Thompson reported to his officials that the PGC Sheriff's Office contacted him and asked him to surrender to an outstanding warrant at their office on Wednesday, February 25, 2004.  RO Thompson complied and on Wednesday, February 25, 2004, was arrested for an Outstanding Warrant #D031285925 charging him with "Telephone Misuse; Repeat Call."  He was transported to the PGC Commissioner's Office in Oxon Hill, MD, released on a $3,000.00 bond and ordered to return for proceedings on April 16, 2004.  RO Thompson was also served a TPO by petitioner Ms. Jameson and directed to appear for a hearing at the District Court of MD for PGC in Hyattsville, on March 1, 2004.

On Thursday, February 26, 2004, as a result of the allegation, RO Thompson was served with a PD 77, and his duty status was changed to a Non-Contact Office Duty status.

On Monday, March 1, 2004, RO Thompson appeared before a hearing for the TPO complaint for harassment, stalking and threats of violence, however, the case was continued because his attorney was not present.

On Monday, March 8, 2004, RO Thompson appeared before the District Court of Maryland for a "Final Peace Order" hearing.  Present were all parties were. Testimony revealed in the end that the petitioner (Ms. Jameson) could not clearly convince the court of her personal relationship and knowledge with RO Thompson. Therefore, the Judge denied the petitioner's request for a Peace Order, and continued the criminal hearing to April 16, 2004.

It appears to this Agent that RO Thompson and Ms. Torrence may have invented the story of how Ms. Torrence befriended Ms. Jameson, because Ms. Jameson said she had never seen Ms. Torrence before until she appeared in court. Ms. Jameson said she knew RO Thompson since 1998, and said his home address and that he lived with his mother.  Ms. Jameson also identified by name RO Thompson's past three employments, something that his girlfriend Ms. Torrence who is described by both have dated since 1996/97 could not do.

On Tuesday, March 23, 2004, RO Thompson presented a letter to the IPS that he had received in the mail from the court informing him of the final disposition of the criminal complaint filed against him from the District Court of Maryland for PGC, Maryland. The State of Maryland "Nolle Pros" the criminal charges on March 16, 2004, because the State Attorney's had determined that the case would not be prosecuted.

Ms. Linda Jameson the complainant was interviewed by this Agent and recounted her allegations against RO Thompson, expressing her decision that she does not wish to pursue this matter any further. She has since relocated and moved out of the country for fear of RO Thompson, and the threats he has made against her and her family. Her mother Ms. Anderson said that her daughter left word that she would not return any calls made by this Agent.

However, on June 2, 2004, a photograph was obtained from the complainant's mother, Mrs. Anderson, which shows two pictures of RO Thompson standing alone that was processed on May 5, 2000, which Mrs. Anderson positively identified. Additionally, this Agent recognized the background scene of the photograph as the living room of Mrs. Anderson home.

Also, during this investigation evidence showed while viewing RO Thompson's Personal History Statement that he prepared prior to being hired with MPD, he falsified his application for employment and omitted his use of marijuana.

Evidence witnessed by this Agent and noted is that RO Thompson disclosed when applying for the PGCPD in 2000 that he used, sold and transported marijuana from 1995 through 1996. Specifically, on October 6, 2000, RO Thompson noted on the PGCPD Preliminary Questionnaire that he used marijuana nine (9) times. When RO Thompson was asked if he noted these instances he replied, "yes."

RO Thompson admitted to noting that he did not use of marijuana on his MPD Personal History Statement, and said it was because he did not smoke it, but a friend blew it into his mouth.

Noted also on the PGCPD Questionnaire by RO Thompson was that he last used marijuana in 1996 and that he sold marijuana on school property from 1995-1996.

Evidence shows that RO Thompson falsified his MPD Personal History Statement to secure employment by placing an "X" in the "No" box for use of marijuana.

On Thursday, May 20, 2004, RO Thompson was re-interviewed for follow-up questions by this Agent. RO Thompson was asked if he applied to the PGCPD, and he affirmed that he did.

RO Thompson was asked did he admit to drug use when he applied with the PGCPD in 2000, he replied that he did.

When RO Thompson was asked if he sold drugs he stated that he was the standby person of a friend who did sell drugs in high school.
When RO Thompson was asked if he wrote that he sold drugs on his PGCPD Questionnaire he replied that he did.

RO Thompson was asked to explain in his MPD Personal History Statement the "X" he noted under the "No" box", which ask if he used illegal drugs, specifically marijuana. RO Thompson stated that he did not smoke the marijuana, but that it was blown in his mouth, therefore that is why he indicated "no".

## RECOMMENDATION

The fact that Ms. Jameson does not wish to pursue this matter any further, along with the lack of cooperation from Ms. Torrence, does not negate to the fact that there is sufficient evidence to the allegations made by Ms. Jameson. The following factors show a preponderance of evidence that the allegations of Threats and Telephone Misuse be classified as **SUSTAINED**:

> PGCPD. documents for "Calls for Service" to Ms. Jameson's home on February 22, 2004.

> A Verizon telephone bill showing nine (9) trace calls made to Ms. Jameson's home on February 22, 2004.

> A police report dated February 22, 2004, for "Vandalism to Auto" of Ms. Jameson's car parked in front of her house four hours later (after the harassing telephone calls were made

> During his testimony in court, RO Thompson denied knowing Ms. Jameson. However, a photograph shows him standing inside Ms. Jameson's mother's home. The photograph was processed on May 5, 2000.

Additionally, as to the false omission on use of marijuana by RO Thompson on his MPD Personal History Statement in securing employment, it is recommended that this allegation be classified as **SUSTAINED.**

This investigation revealed that RO Troy Thompson violated the following General Orders:

Charge No. #1:                          Violation of General Order 1202.1 Part 1, Section B-12, Conduct Unbecoming of an Officer, which reads including acts detrimental to good discipline, conduct that would affect adversely the employee's or the agency's ability to perform effectively, or violations of any law of the United States, or any law, municipal ordinance, or regulation of the District of Columbia.

Specification No. #1:

On or about February 22, 2004, Recruit Officer Troy Thompson repeatedly telephoned Ms. Jameson at her home and verbally threatened her. He was arrested by the PGCPD on a warrant for telephone misuse and threats.

Charge #2:

Violation of General Order Series 1202, Number 1, Part I-B-6, which provides: "Willfully and knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his/her official duties as a Metropolitan Police Officer to, or in the presence of any superior officer, or intended for the information of any officer, or making an untruthful statement before any court or hearing." This misconduct is further defined in General Order Series 201, Number 26, Part I-B-30 which provided a relevant part: "When questioned by superior officers in connection with matters relating to the official business of the police department, subordinate members shall respond truthfully." This misconduct is defined as cause in Title 1, Section 617.1 (d), Number(s) (4) (6) of the D.C. Code.

Specification No. #1

On March 1, 2004, RO Thompson appeared before the District Court of MD and testified that he did not know the complainant, Ms. Jameson. However, evidence shows that he did know Ms. Jameson, and her mother, Mrs. Anderson produced a photograph picture to OIA that was processed on May 5, 2000, which shows two single photos of RO Troy Thompson standing in the living room of Mrs. Anderson's home.

Specification No. #2:

On May 4, 2004, RO Thompson was interviewed at OIA by this Agent and denied knowing Ms. Jameson. However evidence shows on a photograph provided

by the complainant's mother that shows RO Thompson standing in her living room, and is noted as being processed on May 5, 2000.

Charge No #3:

Violation of General Order 1202.1 Part 1, Section B-17, Fraud in securing appointment or falsification of official records or reports.

Specification No. #1:

On or about January 3, 2003, Recruit Officer Troy Thompson falsely certified on his MPD Personal History Statement to gain employment that he did not use marijuana. However, a prior application with the PGCPD in 2000, RO Thompson wrote that he used marijuana nine times, and when questioned about his prior admission, he admitted it to be true. Additionally, in viewing the Prince Georges County Police Department's, Personal History Statement signed by RO Thompson, he noted that he sold marijuana on school property in the past.

Based on the Sustained allegations indicated above, it is recommended that Recruit Officer Troy Thompson be terminated from the Metropolitan Police Department.

It if further recommended that a copy of this report be forwarded to Human Services Division for review on its policy of when investigators are required to check with other law enforcement agencies when applicants list them in their Personal History Statement, as well as, a standard cursory check of surrounding law enforcement agencies prior to appointment.

Emmanuellen C. Moore
Agent
Special Investigation Section

Attachments