# EXHIBIT 10

IN THE SUPERIOR COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISON

TROY A. THOMPSON,              )

    Plaintiff,            )  CIVIL ACTION NO.:

v.                       )   106 CV 00013

DISTRICT OF COLUMBIA,     )

    Defendant.            )

                            )

----------------------

Deposition of TROY ANTHONY THOMPSON,

taken on Friday, December 28, 2007 at 10:00 a.m.,

at the Office of the Attorney General for the

District of Columbia, One Judiciary Square, 441

4th Street, Northwest, Suite 600 South,

Washington, D.C., before E. Marsellas Coates,

Notary Public.

--------------------

Reported by:

E. Marsellas Coates

```
 1  APPEARANCES:

 2

 3          REUBEN B. COLLINS, II, ESQUIRE

 4          COLLINS & TALLEY

 5          201 Centennial Street

 6          Suite A-2

 7          La Plata, Maryland  20646

 8          (301) 934-4366

 9              On Behalf of the Plaintiff

10

11          DAVID A. JACKSON, ESQUIRE

12          OFFICE OF THE ATTORNEY GENERAL

13          FOR THE DISTRICT OF COLUMBIA

14          One Judiciary Square

15          441 4th Street, Northwest

16          Suite 600 South

17          Washington, D.C.  20001

18          (202) 724-6618

19              On Behalf of the Defendant

20

21
```

```
1              P R O C E E D I N G S

2              ----------------------

3              TROY ANTHONY THOMPSON,

4 being first duly sworn to tell the truth, the

5 whole truth, and nothing but the truth, testified

6 as follows:

7              EXAMINATION BY MR. JACKSON:

8      Q.  Sir, will you state your full name for

9 the record.

10     A.  Troy Anthony Thompson.

11     Q.  Mr. Thompson, my name is David Jackson.

12 I represent the District of Columbia in this

13 lawsuit that was brought by you.

14              Let me ask you, have you ever had your

15 deposition taken before?

16     A.  Yes, I have.

17     Q.  You have.  So you're familiar with some

18 of the ground rules, so let me just go over them

19 with you.

20              During the course of this deposition I'm

21 going to be asking you some questions as it
```

1      Q.  Do you recall when you were notified

2  that you would be allowed to attend the Police

3  Academy for the recruit officers?

4      A.  I was notified that I would be in the

5  class of August 2003.  I got a notice in the

6  mail, and my recruiter that was doing my

7  background investigation contacted me as well.

8      Q.  And prior to applying to the D.C. Police

9  Department, did you also apply to the Prince

10  George's County Police Department?

11      A.  Yes, I did.

12      Q.  And when was that?

13      A.  It was in '01.

14      Q.  Do you remember what month?

15      A.  No.

16      Q.  Did you attend the PG County recruit

17  program?

18      A.  No, I did not.

19      Q.  Why not?

20      A.  They said somebody else was more

21  qualified when they sent me the letter.  I

1 applied for PG twice.  After I got the first

2 letter I applied again.

3      Q.  Okay.  Well, in 2001, that was your

4 first application?

5      A.  Uh-huh.

6      Q.  Okay.  And the result of that

7 application, they told you that somebody else was

8 more qualified?

9      A.  Yes.  They sent me a letter.

10      Q.  Do you have a copy of that letter?

11      A.  It's possibly somewhere at home.

12      Q.  Have you searched your records at home

13 to find out whether or not you would have any

14 documents related to this case?

15      A.  Relating to -- when you say relating to

16 this case, what do you mean?

17      Q.  Or relating to the allegations in your

18 complaint?

19      A.  As far as the discrimination?  Or are

20 you talking about as far as PG?  I mean, I need

21 you to elaborate.

1    Q.  And the questions in that preliminary

2 booklet, what do they ask you as it related to

3 drug usage or drug sales?

4    A.  It asks you have you ever experimented

5 with marijuana.  I raised my hand and asked the

6 recruiter or investigator, the gentleman that was

7 there in charge of personnel, I asked him -- I

8 raised my hand, I said, I've never been -- I've

9 never smoked marijuana before.  I said, but I've

10 been around it.  Meaning --

11    Q.  Okay.  So let me interrupt you, and I

12 don't mean to interrupt you.  So when you fill

13 out this booklet, you are actually at a

14 government office in a room with somebody or some

15 people?

16    A.  Yes.

17    Q.  And is the people who are making the

18 application to the Police Department --

19    A.  These are -- they're applicants that's

20 in there filling out the blue booklet and it's

21 also investigators, I guess they're recruiters as

1 well, that's in there.  So if you have any

2 questions, you can raise your hand and get better

3 clarification.

4      Q.  So is this the first time that you

5 applied to PG County?

6      A.  Yes.  That's during the first time.

7      Q.  Okay.  And there were questions on the

8 exam about drug use?

9      A.  Yes.

10      Q.  And were the questions on the -- I'm

11 sorry -- not on the application.  Were there

12 questions on the application about the sale of

13 drugs?

14      A.  Yes.

15      Q.  And what did you put on your application

16 as it relates to drug use?

17      A.  I raised my hand to the investigator.

18      Q.  Okay.

19      A.  He came over.  He asked me --

20      Q.  I'm sorry.  But my question is, what did

21 you put on the application?

1      A.   On the application?

2      Q.   As it related to drug use?

3      A.   Well, I'm trying to get to that so you

4 get a better understanding from what it is --

5      Q.   Well, what I would like for you do is

6 answer my question.  We can back up at some

7 point.  But I just want to know what you put on

8 that application?

9      A.   The recruiter or investigator, after I

10 explained to her what happened, told me to put

11 down yes.

12      Q.   Yes to what?

13      A.   To marijuana smoke.

14      Q.   Okay.  And so you put down yes --

15      A.   Yes.

16      Q.   -- to marijuana smoke?

17      A.   As instructed by the investigator.

18      Q.   Did it ask you how many times you may

19 have used marijuana?

20      A.   Yes.

21      Q.   And what did you state in terms -- in

1 response to that question?

2      A.  In response to that question, as I

3 explained to my investigator, by me being around

4 it and never smoking it nine times, he indicated

5 put down nine times.  Even though I never smoked

6 it.

7           His interpretation was, being around it

8 was the same thing as smoking it.

9      Q.  And there was a question on there

10 relating to the sale of drugs?

11      A.  Uh-huh.  Correct.

12      Q.  And you answered that in the

13 affirmative?

14      A.  Yes.

15      Q.  And did you indicate on that application

16 how many times you were involved in the sale of

17 drugs?

18      A.  I indicated to my investigator or

19 recruiter that was there at that time, that I had

20 been around people that sold drugs.  And he

21 indicated that, if an officer was to come in and

1 -- in a room and there was like drugs on the

2 table, everybody would get locked up, because

3 it's in your proximity.  So, therefore, he looked

4 at it as, me being around it is the same thing as

5 selling it, so.

6      Q.  And did you indicate to the -- on the

7 application how many times you had been around

8 the drugs?

9      A.  I don't think it gave a specific time,

10 but -- I don't think it gave a specific time for

11 how many times you were around it.

12      Q.  Was there a question -- and now we're

13 just talking about this first application?

14      A.  Correct.

15      Q.  Was there a question on that application

16 that asked you whether or not there was any

17 financial gain from the sale of drugs?

18      A.  From my -- my understanding, hearsay,

19 from people that you were in high school -- this

20 all happened when I was high school --

21      Q.  Okay.  That's not my question.  My

1 question is, on the application, was there a

2 question that asked you -- asked you whether or

3 not the -- there was any financial gain from that

4 sale of drugs?

5      A.  Yes.

6      Q.  Okay.  And what did write in response to

7 that question?

8      A.  In response to that question, of

9 hearsay, from what I heard from other people,

10 they -- they indicated to me they made $12,000 a

11 week.  So when I explained that to the

12 investigator, by him -- by me being around it,

13 for me to put down $12,000 a week.

14      Q.  And were there any other questions on

15 that application that related to either the use

16 or sale of drugs?

17      A.  I can't recall if there was any other

18 questions.  Only questions that I know that were

19 on there.  There might have been some other

20 questions, but that was so long ago, I can't

21 remember every question.  But those two questions

1 stuck out to me.

2      Q.   Now, after you completed app -- and, by

3 the way, did you sign that application?

4      A.   Yes.  I had to sign it.

5      Q.   After you completed the application, did

6 you have a personal interview with anybody from

7 the PG County Police Department?

8      A.   No, I did not.

9      Q.   Did anybody from PG County Police

10 Department contact you in regards to the answers

11 that you gave on that first application?

12      A.   No, they did not.

13      Q.   And my understanding from your testimony

14 is that, after completing the application, then

15 at some point you received a letter from the PG

16 County Government saying that some of these other

17 people were more qualified then you?

18      A.   Yes, sir.

19      Q.   And did you make any attempts to inquire

20 as to what qualification you were lacking?

21      A.   No, sir.  I did not inquire.

1     Q.  Now, the second application,

2 approximately six months later?

3     A.  Correct.

4     Q.  Were there similar questions on that

5 application relating to drug use and sale?

6     A.  Yes, sir.

7     Q.  And in terms of the drug sale -- I'm

8 sorry, drug use, what did you respond, or what

9 did you write in response to that question on

10 your second application?

11     A.  On my second application, I raised my

12 hand, I explained the situation to that -- I

13 mean, investigator/recruiter.  And the

14 investigator/recruiter, on the second one

15 indicated that, the recruiter that told you the

16 first time, told you incorrect.  So that's no.

17         He asked he had I ever put to my lips

18 and smoked it, I indicated no.  I said it was

19 blown in my direction one time, when someone

20 called my name.  And he said, well, then, that's

21 not the same thing as smoking, so put down no.

1     Q.  And is that what you wrote on the

2 application?

3     A.  I checked no.

4     Q.  And on the second application was there

5 a question dealing with the -- question dealing

6 with the sale of drugs?

7     A.  Yes, there was.

8     Q.  And what did you write in response to

9 that question?

10     A.  I explained the situation again to the

11 recruiter or investigator that was present.  He

12 said, being around it -- he said, did you do any

13 type of hand-to-hand sale, I said no.  He said,

14 then that's not selling it, put no -- you don't

15 have to answer that.

16     Q.  The first recruiter, do you remember his

17 or her name?

18     A.  No, I did not.

19     Q.  The second recruiter, do you remember

20 his or her name?

21     A.  No, I did do not.

1      Q.   Now, based on the second application,

2  were you notified, by PG County, as to whether or

3  not they were going to hire you as a police

4  officer?

5      A.   I didn't get anything in the mail on the

6  second at all.

7      Q.   Nothing at all?

8      A.   Nothing at all, no.

9      Q.   You went through the same process on the

10 second as you went through for the first?

11     A.   Correct.

12     Q.   You were in the room with other

13 applicants filling out applications?

14     A.   Yes.  Application -- and investigators/

15 recruiters as well.

16     Q.   And did you make any inquiries, at PG

17 County, as to why you have not heard in relation

18 to the second application?

19     A.   No, I did not.

20     Q.   Why not?

21     A.   At that time I -- I just didn't inquire

1      A.   (Reviewing resume'.)   7/01 to 8/03 I

2 worked at Logicon, which was North -- we called

3 Northrop Grumman.

4      Q.   I'm sorry, you worked at where?

5      A.   Northrop Grumman.

6      Q.   Okay.   And what was your position there?

7      A.   My position there was a senior PC

8 support analyst.

9      Q.   And why did you leave that company?

10      A.   I joined the Metropolitan Police

11 Department in '83.

12      Q.   Now, when you filled out the application

13 -- by the way, do you have a copy of your

14 application that you filled out for this D.C.

15 Police Department?

16      A.   No.   They didn't give us copy of it.

17      Q.   And when you filled out the application

18 for the D.C. Police Department, were there

19 questions on that application as it relates to

20 drug use and/or sale or the sale of drugs?

21      A.   I don't believe it was anything

Page 30

1 specifically talking about the sale of drugs.

2 But I do remember there was a question on there

3 as far as the usage -- or experimenting with

4 marijuana.

5        Q.   Okay.  And did they -- did the question

6 specifically ask you about marijuana or just ask

7 you about drug use in general?

8        A.   Drug use in general.

9        Q.   And --

10        A.   But marijuana was one of the drugs that

11 were on there.  I think it was cocaine, heroin,

12 and so other questions of drugs.

13        Q.   So do I understand you correctly that

14 there's a general question, and then under that

15 question there's a list of different drugs that

16 they want you to --

17        A.   Correct.

18        Q.   Is that how it works?

19        A.   Yes.  I believe so.

20        Q.   Did you go through the same process,

21 i.e., that you're in a room with other

1 not sure what her rank was.  She didn't -- she

2 didn't have any like sergeant ranks on or

3 lieutenant ranks or anything of that nature.

4      Q.  Now, in response to the questions that

5 were on the D.C. application as it related to

6 drug use, did you answer those questions?

7      A.  As I explained the situation to my

8 investigator for D.C., the way same way I

9 explained it to PG.  And she indicated that

10 interpretation -- you know, the investigator for

11 PG may have looked at it as being around it may

12 be smoking it.  But she said that's not -- have

13 you ever put it to your lips, I indicated no, it

14 was blown in my direction one time.

15      Q.  Did you answer the question?

16      A.  Yes.  I answered the question.  I

17 answered the question, yes.

18      Q.  What -- what was your answer in response

19 to the D.C. application related to drug use?

20      A.  My answer to D.C. was no, as instructed

21 by my recruiter at that time for D.C., after

Page 33

1 explaining to her the situation.  But she also

2 said, where it says other agencies, at the

3 bottom, have you ever applied for any other

4 agencies, she said put down PG, because you did

5 apply for it, and I'll investigate it.

6      Q.  Did you provide any information on the

7 D.C. application as it relates to sale of drugs?

8      A.  That was -- I -- I explained to my

9 investigator about the -- being around people

10 that sold drugs.  And she indicated that she

11 would look into it.  I don't believe the

12 questions -- there were questions on PG's booklet

13 that specifically asked certain questions.  And

14 D.C. does not ask in those -- in their blue book,

15 their background booklet.  But I believe she

16 checked into all that.

17      Q.  Who do you believe checked into that?

18      A.  My investigator, for the D.C., my

19 recruiter.

20      Q.  Checked into all what?

21      A.  Check into actually, I guess, what I had

Page 34

1 put down on my booklet, and PG -- what I put down

2 in my PG booklet as well.

3      Q.  Did you talk with your recruiter,

4 Recruit Officer Robinson, about any conversations

5 she may have had with people over at PG County?

6      A.  No.  I did not.

7      Q.  So August of 2003, you were allowed to

8 attend the D.C.'s Recruit Academy, right?

9      A.  Yes, sir.

10      Q.  And was your class assigned a Sergeant?

11      A.  Yes, sir.

12      Q.  Do you know who that Sergeant was?

13      A.  Sergeant Taylor.  Sergeant Damian

14 Taylor.

15      Q.  Prior to going -- or becoming a recruit,

16 did you know Sergeant Taylor?

17      A.  No, I did not, sir.

18      Q.  I just want to go through some of the

19 facts in your complaint.  I just want to get some

20 specific information.

21           According to you, and Mr. Collins -- I'm

1 reading from paragraph 7 of the complaint -- you

2 claim that in September 2001 you overheard

3 Sergeant Taylor making an offensive and

4 inappropriate remark to a female recruit?

5      A.  You said 2001?

6      Q.  I'm sorry.  2003.  I'm sorry?

7      A.  Yes.  Yes, sir.

8      Q.  Who was the recruit?

9      A.  The recruit was Hutchings, Recruit

10 Officer Hutchings, at that time.

11      Q.  And Officer Hutchings, what was her

12 race?

13      A.  She was a black female.

14      Q.  And what was the comments or offensive

15 language that you heard Sergeant Taylor allegedly

16 making to Officer Hutchings?

17      A.  He made a comment indicating, do you

18 know who your baby's father is?  And I took

19 offense to that, because as an official, those

20 comments should not be conducted, or should not

21 be stated to recruit officers.

1    Q.  Where was this comment made?

2    A.  It was a hallway in residential.  We

3 were in residential.  We were leaving at the end

4 of the day to go home.

5    Q.  And what did Officer Hutchings say?

6    A.  She was very offended by the comment

7 that a ranking officer -- official, I should say,

8 made -- indicated.  And I took offense to it as

9 well.

10    Q.  What did she say?

11    A.  She said she didn't appreciate the

12 comments that Sergeant Taylor had indicated to

13 her.

14    Q.  Who else was present when Sergeant

15 Taylor made these comments?

16    A.  The whole class.  The whole class was

17 present.  He was going down the line.  We were

18 doing pushups and he was going down the line

19 asking people, do you know who your baby's father

20 is, or if it was guys, you -- are you sure that

21 that's the baby that you conceived, you know,

1 your child's mother and things like that.  That's

2 when he got -- so that offended me.

3        Q.  So he was making comments of a similar

4 nature to all the recruits, not just Officer

5 Hutchings?

6        A.  Right.

7        Q.  Now, when you say that you were offended

8 by it, what did you do?

9        A.  I went to -- spoke to Sergeant Taylor

10 and asked him, you know, I felt -- letting him

11 know, actually, that I was offended with the

12 comment that he had made.

13       Q.  Did he say the same thing to you?

14       A.  He said to me, I'm an official and you

15 are a recruit.

16       Q.  And so maybe my question wasn't clear.

17 As he's going down the line making these

18 different comments to -- to the female and male

19 recruit officers --

20       A.  Uh-huh.

21       Q.  -- what did he say to you?

1     A.   He asked me the same question.

2     Q.   Meaning, are you sure what you -- I'm

3 sorry, what's the comment again?

4     A.   The comment was, are you sure that the

5 child -- do you know who your baby's father is,

6 with the females.  And with the males, are you

7 sure that that's, you know, your child.

8     Q.   So when did this conversation between

9 you and Sergeant Taylor take place?

10     A.   It took place after class, after

11 everybody had left.

12     Q.   Where at?

13     A.   In front of residential.

14     Q.   Outside or inside?

15     A.   Outside.

16     Q.   And what did you say to Sergeant Taylor?

17     A.   I explained to Sergeant Taylor that the

18 comments that he had made was very offensive to

19 me, and I didn't appreciate the comment that he

20 had made to Hutchings and the rest of the people

21 in the class.

1          They may not have taken offense to it,

2 but I took offense to it.  And he indicated to me

3 that, I'm an official, and you are a recruit, and

4 that was it.

5      Q.  And that was it?

6      A.  Yes.

7      Q.  Did you report Sergeant Taylor to any of

8 Sergeant Taylor's officials?

9      A.  Not -- I don't believe, not at that

10 time.

11      Q.  How many times did you hear Sergeant

12 Taylor make those comments to the recruits?

13      A.  That was the only time he made that

14 particular comment.

15      Q.  By the way, do you -- do you know how

16 many individuals were in your class?

17      A.  I believe there was total of -- between

18 20 to 25 people in our class.

19      Q.  And how many males and how many females?

20      A.  I can't give you exact of how many

21 males, but it was pretty much equal, male and

1 female.

2      Q.  And were there white females in this

3 recruit -- recruit class?

4      A.  Yes, there were.

5      Q.  And Sergeant Taylor said the same thing

6 to them?

7      A.  Yes.

8      Q.  And there were both white and black men

9 in this recruit class?

10     A.  Yes, there were.

11     Q.  And sergeant Taylor said the same thing

12 to them?

13     A.  Yes.

14     Q.  What other problems, if any, did you

15 have with Sergeant Taylor?

16     A.  Sergeant Taylor let two recruits break

17 into the residential building, after hours, to

18 steal another class's flag; a female recruit,

19 black female recruit, and a Caucasian female

20 recruit.

21          When it was brought to his attention,

Page 41

1 Sergeant Taylor didn't take proper police action.

2 And I mentioned that to him, at that moment in

3 time.  And, once again, we had differences of

4 opinions.

5           Also, when Sergeant Taylor had another

6 recruit coming to work smelling of alcohol.  It

7 was brought to his attention, and Sergeant Taylor

8 just let the actual recruit, Caucasian, sit

9 downstairs in the cafeteria the whole day without

10 disciplinary action.

11           And it indicates in the Recruit Handbook

12 that no recruit can come to -- report to Facility

13 under the influence of any type of drug or

14 alcohol.

15     Q.  Now, you -- let me just talk about the

16 first instance that you allege -- your testimony

17 was that Sergeant Taylor let two females break

18 into a building.  What do you mean by he let

19 them?

20     A.  Meaning, it was brought to his attention

21 and he didn't do anything about it.  He didn't

1 well.

2      Q.  Who brought it up?

3      A.  Senior Officer Gilbert, who was down in

4 residential at that time.  He brought it up to

5 our class, indicating that, you know, what the

6 two recruits have done was not right.  And

7 Sergeant Taylor also addressed, you know, the

8 class in front of the two recruits that, you

9 know, breaking into a building was against

10 regulations of the Recruit Handbook.

11      Q.  Were Officer Cole and Officer

12 Roddenhover there?

13      A.  Yes.  Yes, they were.

14      Q.  What did they say?

15      A.  They didn't say anything.  They couldn't

16 say anything.

17      Q.  What did Sergeant Taylor say?

18      A.  What I just stated, that, you know,

19 breaking into a residential building, after

20 hours, is not tolerated.  And that any recruit

21 shouldn't do that.  But they were not

Page 46

1 Roddenhover is a Caucasian female.

2      Q.  Now, you also indicated that Sergeant

3 Taylor was aware that two of the -- two of the

4 male recruit officers --

5      A.  The males.

6      Q.  Correct.

7      A.  Uh-huh.  Go ahead.

8      Q.  -- came to work smelling of alcohol?

9      A.  It was only one recruit came to work

10 smelling like alcohol.

11      Q.  So in paragraph 9 of your complaint,

12 that reads, "In or about January of 2004

13 Plaintiff learned that two Caucasian male

14 recruits in his class came to work smelling of

15 alcohol."  Is that incorrect?

16      A.  Yes.  It's only one -- only one recruit

17 that came to work smelling like alcohol.

18      Q.  And what was the recruit's name?

19      A.  Charles Holsom (phonetic).

20      Q.  And then you allege that the -- the

21 recruit confessed to Sergeant Taylor that he had

1 been drinking the previous night?

2    A.  Correct.

3    Q.  Correct?

4    A.  Yes.

5    Q.  How do you know that he confessed to

6 Sergeant Taylor?

7    A.  Because when -- after roll call,

8 Sergeant Taylor came and spoke to Officer Holsom

9 about it, and Officer Holsom confessed that he

10 had been drinking the night before.  And it was

11 brought to Sergeant Taylor's attention.

12    Q.  Were you present when this --

13    A.  The whole class was present.

14    Q.  And where did this confession take

15 place?

16    A.  It took place in roll call, at roll

17 call.

18    Q.  And what is the basis for your

19 allegation that no investigation was conducted or

20 no disciplinary action was taken?

21    A.  Because the recruit indicated that all

1 they did was sit him downstairs in the cafeteria,

2 the whole day.  And he indicates that there was

3 no disciplinary action brought towards him.

4     Q.  When did you have this conversation with

5 this -- this recruit officer?

6     A.  Maybe the next day, because he wasn't in

7 class.  That day they sent him downstairs.  When

8 the incident happened they sat him downstairs in

9 the cafeteria.  So the next day when he reported

10 to class.

11     Q.  And how many times did you talk with him

12 about the incident?

13     A.  I only talked to him one time about the

14 incident.

15     Q.  So is it fair to say that you don't know

16 what happened a week later?

17     A.  I don't know what happened a week later.

18 But I don't believe that anything came out of it,

19 because he was still in the Academy.

20     Q.  Do you have any facts to support your

21 belief that nothing came out of it?

1     A.   No.   I don't have any facts, no.

2     Q.   Now, did you have a conversation with

3 Sergeant Taylor about this?

4     A.   Yes, I did.

5     Q.   And what did you -- tell me about that

6 conversation?   Where did this conversation occur?

7     A.   This conversation occurred in the

8 hallway at the building of the Academy, where we

9 were going to class.

10     Q.   So did you approach Sergeant Taylor?

11     A.   Yes.   I approached Sergeant Taylor.

12     Q.   And what was your purpose for

13 approaching Sergeant Taylor?

14     A.   I asked Sergeant Taylor if a drunk

15 officer or a drunken officer come to work

16 smelling like alcohol, how can he back me up on

17 the street, as far as, you know, protecting my

18 life or, you know, the citizens of the District

19 of Columbia; what should I do?   And he indicated

20 to me, don't make yourself a target on this

21 Department, Mr. Thompson.

1     Q.   Did he use the word victim?

2     A.   No.  He said target.

3     Q.   You sure?

4     A.   Possibly target or victim or one of

5 them.  But he -- I believe it was target, or

6 victim with the Department; one of them.  One of

7 the quest -- one of the statements.  I would have

8 to look back at my notes.

9     Q.   What other incident did you have, if

10 any, with Sergeant Taylor?

11     A.   There was another incident that I had

12 with Sergeant Taylor when I was in the Academy.

13 We were doing the Code of Ethics.

14     Q.   Uh-huh.

15     A.   Meaning, you know, you say the speech of

16 the Code of Ethics, at graduation, as a whole

17 class.  I messed up on the bottom line of the

18 Code of Ethics, and I was kind of frustrated with

19 myself, because I had -- you know, kept going

20 over it and kept going over it, but it just, you

21 know, wasn't getting it.  And I was frustrated

1 with myself, because I was trying to do a good

2 job.

3          Sergeant Taylor indicated to me that, I

4 shouldn't be frustrated with him.  And I said,

5 Sarge, I'm not frustrated with you, I'm

6 frustrated with myself.

7          He called me in the -- out in the

8 hallway, started yelling at me, got in my face,

9 spit in my face, telling me that I'm a recruit, I

10 don't -- you know what I'm saying, I should

11 listen and do everything that he says, even if I

12 spit in your face and things of that nature.

13          So he told me to take my uniform -- take

14 his uniform off.  When I took my -- his uniform

15 off and put my clothes on, my regular personal

16 clothes --

17     Q.  Did he tell you why he wanted you to

18 take his uni -- your uniform off?

19     A.  No, he did not.

20     Q.  This reciting the Code of Ethics, is

21 this done in front of the whole class?

1    A.  Yes.  It's done in front of the whole

2 class.

3    Q.  Does each individual stand up and recite

4 the Code of Ethics?

5    A.  Yes, they did.

6    Q.  So when it came time for you to stand

7 and recite the Code of Ethics, you had problems

8 with the last paragraph?

9    A.  Yes.  With the last paragraph of it.

10 And I explained to Sergeant Taylor that I wasn't

11 frustrated with him, I was just frustrated with

12 myself.

13         And at that point in time, everything

14 had went haywire.  And that's when he told me to

15 take his uni -- out in the hallway, he started

16 yelling at me, you know, spit in my face, and

17 told me to take his uniform off.

18    Q.  When you say spin in your face, was he

19 intentionally spitting in your face or was he

20 yelling at you and saliva came out of his mouth?

21 Because I don't understand what you mean by spit

1 in your face?

2      A.  When he was here (indicating), directly

3 in my face, he was, you know, "you a recruit --

4 you a recruit," blah-se, blah-se.  So I stepped

5 back a little bit, because I didn't want to get

6 spit on me.  And that's when he said, you need to

7 stand at attention, do not move, and basically

8 degrading me in a -- in the hallway.

9      Q.  And as a result of that incident, did

10 you see any other official?

11      A.  Yes.  I saw -- I went down to Lieutenant

12 Hayes' office.

13      Q.  Did Sergeant Taylor send you to

14 Lieutenant Hayes' office or did you just go down

15 there on your own?

16      A.  He sent me down to Lieutenant Hayes'

17 office.

18      Q.  And why did he send you to Lieutenant

19 Hayes' office?

20      A.  I guess to speak to the Lieutenant that

21 was in there.

1    Q.  By the way, did you ever recite that

2 Code of Ethic properly?

3    A.  Never got a chance to.  After that, you

4 know, I was never asked to recite the Code of

5 Ethics again.  I didn't perform it with my class,

6 because I wasn't graduating on April 30 with my

7 class.

8    Q.  And so when you went down to see

9 Lieutenant Hayes, what happened?

10    A.  I went to go see Lieutenant Hayes.  He

11 explained to me that, you know, it was just a

12 misunderstanding, things of that nature.

13 Sergeant Taylor gave me an essay to write about

14 conduct, about -- I don't know if you have a copy

15 of the essay that he told me to write.

16        THE WITNESS:  Do you have -- did you

17 give him a copy of that?

18        MR. COLLINS:  If you don't have it, I

19 can give it to you.

20    A.  I wrote the essay.  When I -- took it to

21 Sergeant Taylor the next day, because he asked me

1 something that I didn't do.

2    Q.  Did anybody ever tell you that a recruit

3 officer can be fired for any reason, for any

4 reason at all?

5    A.  At the time when -- if I had known when

6 I was doing the blue -- the background check, I

7 probably would have never applied, but --

8    Q.  And why not?

9    A.  Because if a person come to work one

10 morning and wakes up and says I don't like you

11 because you're taller than me, you're fired; to

12 me that's wrong.  Or you're light-skinned and you

13 have green eyes and things of that nature.

14         I've had similar problems also with

15 Lieutenant -- Sergeant Taylor that, I had got --

16 I had to be sent down to the PFC, because my eyes

17 looked like they were dilated, because my eyes

18 are hazel.  If you look at my eyes, I have light

19 eyes.

20         So he sent me down to the PFC.  A

21 Sergeant Roman escorted me down to the PFC to

Page 59

1 take a urine test, because they thought I as

2 under the influence of something, because of my

3 eyes are, you know, light-skinned under light,

4 and they look like they're hazel.

5         If you know anything about light-skinned

6 with -- or light-skinned eyes, they look like

7 they're dilated, but they're not.

8      Q.  When you were at the Academy, did you

9 ever take any illegal drugs?

10     A.  No, I did not.  Never.

11     Q.  Did you ever come to your work

12 intoxicated?

13     A.  Never.

14     Q.  At some point were you referred to the

15 Police and Fire Clinic for an evaluation by a

16 psychiatrist?

17     A.  They threatened to do that, but I never

18 did.  They never -- I never was sent.

19     Q.  Who threatened to do that?

20     A.  Lieutenant Hayes and Sergeant Taylor.

21     Q.  Did they tell you why they wanted you to

1 have this evaluation?

2      A.  No.  But the evaluation was never done.

3 I was never -- I was never sent.

4      Q.  Do you know a person by the name of

5 Linda Jamison?

6      A.  No, I did not.

7      Q.  You don't know a Linda Jamison?

8      A.  I don't know a Linda Jamison.  I know an

9 Icy, I guess that's Linda Jamison, but I know her

10 by Icy.  I didn't know her by Linda Jamison.

11      Q.  How do you spell Icy?

12      A.  I-C-Y.

13      Q.  Do you know, as of this date, know that

14 Icy's name is Linda Jamison?

15      A.  Yes.

16      Q.  And when did you find that out?

17      A.  I found that out once.  I had some

18 charges brought up on me with Prince George's

19 Community College -- I mean, Prince George's

20 County Police Department.

21      Q.  And when were those charges brought

1 against you?

2      A.  I would have to look directly at my

3 notes, but I believe it was in February, I

4 believe.

5      Q.  Of what year?

6      A.  Of 2004.

7      Q.  Okay.  And how long had you known Icy as

8 of 2004?

9      A.  I only met her twice.  She knew my

10 girlfriend at the time.  She knew my girlfriend

11 Latonya Torrance.

12      Q.  Who is your girlfriend?

13      A.  She knew my girlfriend at that time,

14 Latonya Torrance.  That's how I was introduced to

15 Icy.  And I only seen Icy twice.

16      Q.  Is Ms. Torrance still your girlfriend?

17      A.  As of right now, no.

18      Q.  When did you break off that

19 relationship?

20      A.  I broke off the relationship with

21 Ms. Torrance after everything had completed.  We

1    Q.  Yes.

2    A.  I don't know where she works at.  That's

3  -- that's the last employment that I knew that

4  she worked at.  I think she just got a new job so

5  she might have switched companies.

6    Q.  Now, at some point you were arrested by

7  the Sheriff, the PG County Sheriff Department?

8    A.  Yes.

9    Q.  And when did that arrest occur?

10    A.  I want to say about maybe February,

11  March.  February or March.

12    Q.  Of 2004?

13    A.  Yes, sir.

14    Q.  And why were you arrested?

15    A.  There was charges out for -- it was a

16  peace order that was out, and a criminal phone

17  harassment charge --

18    Q.  And --

19    A.  -- allegation.

20    Q.  And who made those allegations against

21  you?

1     A.  From my understanding, when I talked to

2 Ms. Torrance, it was her and Linda Jamison, Icy

3 at this time, that I know that made those

4 allegations against me.

5     Q.  And, but Ms. Torrance was your

6 girlfriend at the time, correct?

7     A.  Right.  She was upset because I wasn't

8 returning her phone calls.  So the girl, Icy --

9 from my understanding, the girl, Icy, wanted to

10 have a sexual relationship with Ms. Torrance, but

11 Ms. Torrance wasn't into females.

12          So the girl, Icy, and Ms. Torrance, I

13 guess, got upset and -- Ms. Torrance got upset

14 because I wouldn't return her phone call or

15 wouldn't talk to her.  And at that time they made

16 up this bogus story.

17     Q.  I thought you were -- had a dating

18 relationship with Ms. Torrance at that time?

19     A.  Correct.  But I wouldn't return her

20 phone call.  It was -- you know, I was mad at

21 her, I was studying, trying to get myself

1 phone call or a letter.

2      Q.  You got a phone call from who?

3      A.  A phone call or a letter.  I can't

4 recall.

5      Q.  From who?  Who?

6      A.  Probably been from the Sheriff

7 Department.

8      Q.  Asking -- telling you that there's a

9 peace order, that you have to come to court on a

10 certain day?

11      A.  A peace order, I had to come to the

12 Deputy Sheriff, there's a warrant out for my

13 arrest.  There was a warrant out for my arrest.

14      Q.  So, were you arrested at the Police

15 Station?

16      A.  Yes.  I cooperated.  I went to the

17 Deputy Sheriff's place in Landover, off McCormick

18 Drive, I believe it is.  Went out there to find

19 out what was going on.  Because I don't even know

20 what was going on.

21           MR. JACKSON:  You need to take a break?

Page 74

1 might have been between four to six years.  But

2 I'll say four, when I met Ms. Torrance.  It might

3 have been six, but --

4       Q.  It goes on to say, "within that time,

5 Troy, at one point, pulled a handgun to me and

6 told me he would kill me if I don't do what he

7 says, which was to be in the house."

8           Did you ever hear -- did you ever see

9 that statement before?

10      A.  I've never pulled out a handgun on

11 anybody.

12      Q.  Do you own a handgun?

13      A.  Yes.  I do own a handgun.

14      Q.  Does Ms. Torrance own a handgun?

15      A.  Ms. Torrance knows that I own -- I own a

16 handgun and my gun is registered.  Ms. Torrance

17 knows that.

18      Q.  Do you know how Ms. Jamison would know

19 that you own a handgun?

20      A.  Well, from my understanding,

21 Ms. Torrance had a conversation with Ms. Jamison

1 serious enough, I guess with all of these

2 killings that were going on with domestic

3 violence or whatever, they're -- PG does their --

4 they want to make sure everything is a

5 precaution, so they just send out warrants for

6 anything now.

7      Q.  Has Ms. Torrance ever sought a temporary

8 peace order against you?

9      A.  Me and Ms. Torrance have had

10 difficulties when -- I believe, yes, it was a --

11 a peace order out.  Because she assumed that I

12 had busted out her window in her apartment or

13 whatever.  But come to find out, it wasn't me.

14          And she went to the Court and explained

15 to them that she made a mistake.  She thought it

16 was me, but apparently it was some girlfriend's

17 boy -- boyfriend's girlfriend, who thought that

18 Ms. Torrance and her boyfriend was messing

19 around.  So the girlfriend came through or

20 something like that.  I didn't really get the

21 gist of it.

1    Q.  When was that?

2    A.  Oh, I can't -- it was right before I

3 went to the Academy.  Because I had to explain it

4 to my investigator, at the Academy, my recruiter,

5 and I had to give a statement.

6        And Ms. Jamison -- I mean, Ms. Torrance

7 had to give a statement.

8    Q.  Were you arrested as a result of that

9 incident?

10    A.  No.  No, I was not arrested at all.

11    Q.  Did you appear in court as a result of

12 that incident?

13    A.  No.  I don't think I appeared in court.

14 I'm not sure.  I don't think I appeared in court

15 on that.

16    Q.  Were you served with a temporary peace

17 order?

18    A.  Yes.

19    Q.  Do you have a copy of that temporary

20 peace order?

21    A.  Not with me.

1 wanted her to do?

2      A.  I never talked to Ms. Jamison to

3 threaten her or her family.

4      Q.  Now, at some point the Internal Affairs,

5 from the District of Columbia Police Department,

6 did an investigation of these allegations?

7      A.  Yes, they did.

8      Q.  Were you interviewed during that

9 process?

10     A.  At that time there was an investigator

11 in court, an Internal Affairs investigator in

12 court, but I don't get spoken to of these

13 allegations until after my class had graduated.

14 That's when I found out who my Internal Affairs

15 Agent was.

16     Q.  Okay.  And by the way, just to back up a

17 bit, when you were arrested, were you held

18 overnight or did you go to court that same day?

19     A.  No.  I was released.  I believe -- I

20 think it was a bond, I think, I believe.

21     Q.  How much was your bond?

1      A.   I'm not sure.

2      Q.   Do you remember if it was in the area --

3 somewhere in the area of $3,000?

4      A.   I'm not sure.  You have to ask -- my

5 mother was the one that put up the bond, so it

6 was -- she would have all that information.  And

7 I don't know what my bond was at that time.  I

8 don't -- I don't recall.

9      Q.   When you were released, you never asked

10 your mother how much money she had to put up for

11 a bond for you?

12      A.   No.  Because I was teed off at these

13 allegations that this individual had indicated,

14 was false.  And then when we got to court, then

15 Ms. Jamison kept calling me a different name in

16 court.  And her witnesses that -- that she

17 brought, the guy kept calling me a different

18 name.  And the judge stopped her -- stopped

19 everybody and said, well, who are you referring

20 to?

21           So that's why the allegations of -- were

1 statements from all these other people.  You just

2 -- he just pinpointed certain people in the

3 class.

4          And, also, if I recall correctly, Donnay

5 Davis was the officer that stole the credit card

6 from the lady that's in the newspaper right now,

7 out of her credenza.  So, you know, his

8 credibility, right there, is out of the ordinary.

9          So where are the rest of the statements

10 at from all the other people in the class?

11          MR. JACKSON:  I'm going to be finished

12 in a little -- little while.  Not too much

13 longer.

14     Q.  I just want to talk about these

15 different counts in your complaint.  1, you have

16 Count 1, discrimination based on gender?

17     A.  Uh-huh.

18     Q.  Who do you believe discriminated against

19 you based on your gender?

20     A.  I believe Lieutenant -- Sergeant Taylor

21 had Agent Moore in my case.  So Agent Moore, as

1 far as an Internal Affairs person, her being a

2 black female, discriminated against me, because

3 she didn't do a fair investigation by going back

4 and asking, you know, other people.

5          Also, with the incident with these two

6 recruits that came to work -- I mean, two

7 recruits that broke into residential.

8          And also Recruit Officer Charles Holsom

9 came to work smelling like alcohol, and also Eric

10 Garcia, who was terminated for failing the

11 physical fitness test, but then reinstated as

12 well.  He's hispanic, that was Sergeant Daniels'

13 class in 2000.

14      Q.  All right.  Sergeant Garcia is a male or

15 female?

16      A.  Sergeant -- no.  Recruit Eric Garcia, is

17 a male, hispanic.  He was in Sergeant Daniels'

18 class in 2003; that's when he joined the Academy.

19 He was terminated in May of '04.  He was then

20 reinstated ten months later, so he was in his

21 March class.

1     Q.  And then there was the individual

2 officer or officers who allegedly came to -- came

3 to work smelling of alcohol?

4     A.  This was only one officer, Officer

5 Holsom.

6     Q.  And that was also a man, right?

7     A.  Yeah.  White, Caucasian male.

8     Q.  Okay.  Any other incidents involving men

9 that you're concerned about that you say would

10 support your claim of gender discrimination?

11     A.  I don't have any as of right now, but

12 I'm sure that I can probably try to find some

13 more information.

14     Q.  Now, if Officer Garcia and the white

15 officer who came to work smelling of alcohol,

16 both men, why -- what is the basis for your claim

17 that they discriminated against you because

18 you're a man?

19     A.  Because they're hispan -- one's hispanic

20 and one white, Caucasian.  And I'm going on race,

21 because I'm a black, African-American.

1      Q.   That is a statute that protects people

2 against discrimination based on certain

3 categories.

4      A.   Uh-huh.

5      Q.   Race and gender are two of categories.

6      A.   Uh-huh.

7      Q.   My question to you is, do you believe

8 that Sergeant Taylor retaliated against you

9 because of the fact that you're black?

10      A.   I believe Sergeant Taylor had Agent

11 Moore, who's the investigator, retaliate.  So,

12 yes, I believe that Agent Moore, who is a female

13 for the Department, had -- Sergeant Taylor had

14 some influences on that.  So, yes, they're all

15 combined.  So, yes, I do believe so.

16      Q.   Because you're black?

17      A.   Because I'm black.  And I believe that

18 he used an Internal Affairs, meaning Agent Moore,

19 to put stuff down in her report and leave a lot

20 of stuff out of her report.  So, yes, I do

21 believe.

1         And race discrimination go on gender

2 because of Agent Moore, because he's a black --

3 because she's a female.  And that -- that's who

4 did my investigation.

5    Q.  How did Sergeant Taylor retaliate

6 against you?

7    A.  Sergeant Taylor retaliated against me

8 using the Internal Affairs Agent.  When I asked

9 Sergeant Taylor could I talk to, you know, the

10 Internal Affairs person, he indicated no.

11        Also, how could, you know, all this

12 stuff come about, meaning, when the charges got

13 dismissed out of court, you know, I didn't know

14 -- I didn't talk to my investigator from -- until

15 my class had graduated.  So the whole time my

16 folder is at the Academy, during the time frame

17 from February to May, when it went down to the

18 PFC for, I guess, Internal Affairs person to take

19 a look at it.  Why was my folder held so long?

20        Why was my folder just sitting at the

21 Academy all that time, from February all the way

1 until May.  My folder didn't go down to the PFC

2 until May.  And the reason why I know my folder

3 went down there in May is because, before Eric

4 Garcia got terminated, me and him were the ones

5 that went down th PFC to drop my folder.  And he

6 said, yeah, he just took your folder.  This is

7 your folder right here going down to the PFC.

8 That's how I know my folder was -- what the

9 actual month that my folder went down to the PFC.

10 All that time my folder was sitting at the

11 Academy.

12          And how was Agent Moore able to contact

13 Latonya Torrance in April.

14      Q.  And you believe that they did all this

15 to you because you're black?

16      A.  I believe that Agent Moore -- I believe

17 Sergeant Taylor had something to do with it.  And

18 I believe that Agent Moore, being a female,

19 retaliated against me.

20      Q.  Because you're a male?

21      A.  Because I'm a man.