# EXHIBIT 11

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 1

TROY A. THOMPSON,        *   IN THE

Plaintiff,               *   UNITED STATES DISTRICT COURT

       vs.               *   FOR THE

DISTRICT OF COLUMBIA,    *   DISTRICT OF COLUMBIA

Defendant.               *   CASE NO. 06cv00063

                         *   Judge: Emmet G. Sullivan

       ------------------------------------

       Deposition of DAMION LAMONT TAYLOR, called for

examination by Counsel for the Plaintiff, having been

sworn by Linda M. Shaw, Notary Public in and for the

State of Maryland, taken at the Office of the Attorney

General for the District of Columbia, One Judiciary

Square, 441 4th Street, N.W., 6th Floor South,

Washington, DC 20001, at 4:26 p.m., Wednesday, January

23, 2008.

       ------------------------------------

REPORTED BY:

                    LINDA M. SHAW

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

1          A P P E A R A N C E S

2

3          REUBEN B. COLLINS, II, ESQUIRE

4          Collins & Talley, LLC

5          201 Centennial Ctreet, A-2, P.O. Box 1857

6          La Plata, Maryland 20646

7          Phone: 301-934-4366; 202-546-7323

8          Fax: 301-934-1688; rcollins@dcmdlawyers.com

9          On Behalf of the Plaintiff.

10

11         DAVID JACKSON, ESQUIRE

12         Office of the Attorney General

13         For the District of Columbia

14         One Judiciary Square

15         441 4th Street, N.W., 6th Floor South

16         Washington, DC 20001

17         Phone: 202-724-6618; Fax: 202-727-5625

18         DavidA.Jackson@DC.GOV

19         On Behalf of the Defendant.

20

21    ALSO PRESENT:   TROY A. THOMPSON

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 46

1      A     I brief, I briefly looked at some of it.

2      Q     Okay.  I'd like to ask you, in terms of the

3    incidents where recruits showed signs of intoxication,

4    how were those types of incidents handled?

5      A     A recruit showed signs of intoxication?

6      Q     Yes.

7      A     What type of signs of intoxication?

8      Q     If they were acting out of the ordinary,

9    clearly that they were under some type of a substance?

10     A     If I thought a recruit was clearly under a

11   controlled substance, I would bring that to the attention

12   of my supervisor at the time and follow his directives.

13     Q     Were you aware of an incident that involved

14   Recruit Charles Hoztel?

15     A     I don't know who that is.

16     Q     H-O-Z-T-E-L?

17     A     Am I aware of a --

18     Q     An incident regarding alcohol that involved

19   that Recruit?

20     A     No.

21     Q     Do you know who Charles Hoztel is?

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 47

1       A    I don't know if his name was Hoztel.  I don't

2   remember a Recruit Officer Hoztel.  I can't recall his

3   first name, though.

4       Q    Anything?

5       A    I do vaguely recall having a Recruit Officer

6   Hoztel in my class.

7       Q    Do you recall his nationality?

8       A    I believe he was white.

9       Q    Do you know if he graduated with the '04

10  class?

11      A    I believe he did.

12      Q    Do you recall an incident that involved

13  Recruits Colt and Ridohover?

14      A    Ridohover?

15      Q    R-I-D-O-H-O-V-E-R.

16      A    I remember a Recruit Officer Ridohover.  Who

17  was the other person?

18      Q    Colt.

19      A    Spell that, please.

20      Q    C-O-L-T.

21      A    Colt.  C-O-L-T?

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 48

1        Q     C-O-L-E.  I'm sorry.

2        A     I had a Recruit Officer Cole and a Recruit

3   Officer Ridohover in my class, yes.

4        Q     They were accused of breaking into a

5   residential building.  Do you recall that incident?

6        A     Accused of breaking into a residential

7   building?

8        Q     Yes.

9        A     I don't recall them breaking into a building.

10       Q     Well, do you recall any incident that involved

11  those two?

12       A     I recall a situation where two Recruit Officers

13  went into the Residential Training Facility and retrieved

14  another class's flag.

15       Q     Okay.  Now, was there any disciplinary action

16  taken as a result of that?

17       A     There was no grounds for any consideration for

18  a disciplinary action.

19       Q     So that was not in violation of any of the

20  training responsibilities or acts at that time?

21       A     There was no violation of the Department's

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 49

1    policies or procedures with that incident that would

2    require the recruits to be disciplined.

3        Q    Is this, did this incident happen after

4    hours?

5        A    After hours?  I can't recall the time of day.

6        Q    And were you aware of whether or not the

7    facility was actually locked at that time?

8        A    The facility, I can't recall.  The facility is

9    a 24-hour facility.  I don't, again, the recruits stay

10   there 24 hours, seven days a week, um, five days a week.

11   So I can't recall if it was locked and secured.

12       Q    So, it's your position that, that there was no

13   violation of any actual order or anything as a result of

14   that action?

15       A    It seems that you're referring to a situation

16   where Recruit Officers Cole and Ridohover went down to

17   the Residential Training Facility and retrieved another

18   recruit class's flag.

19       Q    Mm-hm.

20       A    This was a game or thing that goes on between

21   recruit classes to encourage responsibility.  Each class

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 50

1    has a flag, and typically the Recruit Officers try to

2    retrieve each other's class flags that they have left

3    unattended.

4        Q    So this is just a form of, like, general

5    bantering between --

6        A    Yeah.  It's nothing --

7        Q    -- recruits?

8        A    There's no official guidelines that take place

9    with regard to that.

10       Q    And so that would not be considered, based on

11   what you're saying, a form of breaking or entering or any

12   type of serious misconduct?

13       A    Absolutely not.

14       Q    Do you recall any incidents where you directly

15   and verbally reprimanded Mr. Thompson?

16       A    Where I directly and verbally reprimanded Mr.

17   Thompson?  During the most, the most memorable incident I

18   recall is during the recital of the Code of Ethics.

19   Former Recruit Officer Thompson and I had an encounter

20   about his behavior during the course of that exercise.

21       Q    And what -- could you kind of tell me what

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 51

1    happened?

2       A    Well, pretty much the Code of Ethics is about

3    four paragraphs long.  It's pretty long.  And the Recruit

4    Officers, again, are expected to be able to recite that

5    at the graduation date, just during the course of the

6    program.  So the recruits were required to learn a

7    paragraph at a time over about a month's period of time.

8           And on this particular day, the Recruit

9    Officers in a class of, maybe, 24 Recruit Officers, they

10   were on, I think, the last paragraph, and they were all

11   expected to be able to verbally recite it.  So we, pretty

12   much, went around the room, one at a time, and everyone

13   attempted to recite that paragraph.  Any Recruit Officer

14   that stumbled or staggered or seemed to not be able to

15   naturally recite it had to start over.  Everyone was

16   expected to recite it.  A few people stumbled, staggered,

17   had some problems with it, seemed that they didn't know

18   it, so they had to start over.

19          Once I got to Recruit Officer Thompson, at the

20   time, he had the same problem with reciting it.  I told

21   him he had to do it over a couple of times, until I was

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 52

1    comfortable that he recited it well enough to present it

2    to the Chief of Police during the graduation ceremony.

3    He appeared to get agitated, upset because I had him

4    repeat it a few times, and I explained to him that it was

5    his responsibility to learn it.  He had the same amount

6    of time to learn it, like everyone else, and in so many

7    words explained it.  There wasn't a reason for him to be

8    upset about it.  He just had to recite it again.  But

9    again, he appeared to be really emotionally agitated by

10   it.

11          So I asked him to step out into the hallway so

12   that we could discuss it out of the presence of the

13   class.  When we got into the hallway, he assumed this,

14   like, fight position, like, fighting stance, it was like

15   a defensive tactic stance that we train recruits.  He

16   took a fighting, combative stance that really caught me

17   off guard.  I tried to calm him down.  I directed him to

18   go into the bathroom, the restroom and cool down.  He

19   didn't move or say anything.  After that, I directed him

20   to go downstairs and remove his uniform and I reported

21   the incident to the Lieutenant.

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 53

1    Q    Were there any other individuals that witnessed

2    that?

3    A    The entire class witnessed it and the Physical

4    Training Officer witnessed it.

5    Q    I thought you said you all went out?

6    A    Oh, in the hallway part, --

7    Q    Yeah.

8    A    -- or the inside?

9    Q    Yeah.  In the hallway?

10    A    I can't recall.  I don't think, I don't, I

11    didn't, I don't, I can't recall.  There may have been

12    people in the hallway walking up or down the hallway, but

13    I don't recall anyone else.

14    Q    What, what did do you as a result of this

15    incident?

16    A    Well, after that incident, again, I reported it

17    to the Lieutenant who was in charge of the Recruiting

18    Branch.  I had Recruit Officer Thompson come in with the

19    Lieutenant and I asked the Lieutenant to speak with him

20    about the incident.  After that, I spoke to the

21    Lieutenant about other reports that I received from the

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 54

1    Academic Training Branch, the Physical Skills Training

2    Branch, about incidents that had taken place regarding

3    Recruit Officer Thompson.   And I was concerned as to

4    whether he should, he was psychologically fit for, fit to

5    be a Police Officer.

6         Q     Mm-hm.

7         A     So, again, I discussed that with the

8    Lieutenant, and I told him I think he should be evaluated

9    before we graduate him from the Police Academy.

10        Q     Were there any other recruits that you had

11   reached that conclusion in his class?

12        A     I've never, in my four to five years at the

13   Academy, ever had that type of incident take place, so

14   no, I never --

15        Q     He was the only one?

16        A     That I've ever had such an experience with.

17   Yes.

18        Q     Did you receive statements from other recruits

19   about his behavior?

20        A     Yes.   I had every Recruit Officer in the class

21   write a statement, that was in the classroom.

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 55

1       Q     Write a statement regarding Mr. Thompson's

2   behavior?

3       A     I'm sorry?

4       Q     A statement regarding Mr. Thompson's behavior?

5       A     That incident with the Code of Ethics exercise?

6       Q     Right.

7       A     I had every Recruit Officer that was present

8   and the Physical Skills instructor that was present write

9   a statement and I attached it to the recommendation.

10      Q     Did you discipline Mr. Thompson as a result of

11  this, other than -- was there anything else you asked him

12  to do?

13      A     I wouldn't say -- I didn't discipline him.

14  Discipline, again, would be a 750, Letter of Prejudice,

15  or something to that nature.  That wasn't my objective to

16  issue discipline because I knew something like discipline

17  could pretty much eliminate a recruit from ever

18  graduating from the Academy.  I did direct him to write

19  an essay, perhaps to recount what had taken place, and

20  for him to reevaluate his position and what had happened

21  in comparison to what's expected as outlined in the Code

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 56

1    of Ethics and the Department's policies and procedure.

2          Q     So the essay, was that something that your

3    discretion or was that --

4          A     That was my discretion.

5          Q     Were there any other incidents where you

6    requested that a recruit write an essay?

7          A     If -- there, there are numbers of incidents

8    where I had Recruit Officers write statements, and those

9    are completed on a formal PD Form 119, statements about

10   matters that had taken place.  For the most part, a

11   PD-119 will be used as an official witness statement in

12   the course of an official or formal investigation.

13          Again, my intent with Recruit Officer Thompson

14   was not to investigate as a violation for discipline.  I

15   wanted him to pretty much just reevaluate what had

16   happened in hopes that we could correct his, his conduct,

17   his behavior, and he could continue on with his training.

18   I can't recall where I had someone write an essay, but

19   I've had officers write statements on PD form 119's.

20          Q     Now, when you went out in the hall with Mr.

21   Thompson, was it at that time that you told him that he

Page 62

1      A      -- for instance.  That behavior, I feel that I

2   could have articulated that to substantiate a violation

3   of the Conduct Unbecoming Standard for Police Officers

4   and Members of the Department, or perhaps, even

5   insubordination.  The reason that I say that is because

6   the way he addressed me, his aggressive demeanor, tone of

7   voice, his posturing, and the stance he took when he was

8   communicating with me was totally insubordinate for a

9   Recruit Officer to address a supervisor in that fashion.

10             In addition to going into the hallway, the

11   fighting position and stance that he took, to me, was

12   insubordinate, as if he was preparing for some physical

13   altercation which was not the case.  In addition to

14   instructing him to go into the restroom and cool down,

15   and him refusing to follow that directive or order, I

16   feel could have been grounds for willfully disobeying an

17   order from a superior Officer.

18             So, that, in that instance, I feel that those

19   are things that I could have articulated for a

20   recommendation for adverse action, had that been my

21   intent to have him receive adverse action on it, that

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 63

1    being my desire, but that was not my desire at the time.

2        Q    Do you recall any other incidents where you and

3    Mr. Thompson spoke, where there may have been a

4    disagreement between you?

5        A    Not necessarily.  I mean, I felt like Recruit

6    Officer Thompson and I had a fair relationship as I did

7    with any other, every other Recruit Officer in my class.

8    I think even, I've seen Recruit Officer Thompson in one

9    instance, I think he was on a traffic accident.  I think

10   I offered to help him.  I stopped in the street and

11   offered to help him with the accident he was involved in.

12           There were a couple of other personal things

13   that he had going on that he had brought to my attention

14   that I tried to help him out with, just like I would any

15   other of my recruits.  But I don't remember any other

16   altercation that I felt like we were really at odds that

17   I should document or discipline, that comes to mind.

18       Q    Do you remember discussing with him comments

19   made at one, I guess, at one class associated with the

20   use of the term "baby daddy"?  Do you recall any incident

21   like that?

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 64

1        A    No.  No.  I know what you're talking about.

2        Q    But you don't recall any incident where that

3   term became a point of contention between you and Mr.

4   Thompson?

5        A    "Baby daddy"?

6        Q    Yes.

7        A    No.

8        Q    Okay.  Did you ever individually reach the

9   conclusion that Thompson required a psychological

10  evaluation?

11       A    That wasn't my place.  I can't reach that

12  conclusion.  I'm not a psychologist, or any --

13       Q    Did you recommend it?

14       A    I recommended it.  I made a recommendation.

15       Q    And who did you make that recommendation to?

16       A    I made it to, I believe, well, I'd have to look

17  in my report, but I believe it was directed to the

18  Director of the Training Academy, through my chain of

19  command and my immediate supervisor.

20       Q    And that's the normal protocol?

21       A    Yes.

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 69

1    point was a determination made that there would be a

2    recommendation of his termination?

3        A    I have no idea.  I didn't make the

4    recommendation.  I have no idea.

5        Q    So you never made, personally made, any

6    recommendations as to his --

7        A    For his termination?

8        Q    Yes.

9        A    Not that I recall, no.

10       Q    Did you, ever in your report, because you

11   mentioned a report earlier?

12       A    Report of Recommendation -- I'm sorry.

13       Q    No.  Go ahead.

14       A    You asked a Report of Recommendation for the

15   psychological evaluation?

16       Q    Right.  Were there any other reports that were

17   generated by you regarding his fitness as a potential

18   Officer?

19       A    Not that I recall.

20       Q    But what your testimony today is, that you had

21   no involvement in the extension of the probationary

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 71

1    whatever reason, I believe that in Officer Thompson's

2    instance, that did take place, because of an

3    investigation that he had, that was totally non-related

4    to me, that that period of time is normally added on at

5    the tail end for the probationary period for that

6    particular member.

7         Q    What, what do you recall about the, this, these

8    incidents that had nothing to do with you?

9         A    I have no official recollection.  To the best

10   of my knowledge, there was a domestic incident that took

11   place involving Recruit Officer Thompson, but I was not

12   part of that investigation, so I wasn't privy to any

13   information.  But I believe I did hear that there was an

14   investigation and perhaps that was after he had already

15   been removed from my class and placed in another class or

16   placed in a different status.  I just don't, I have no,

17   no recollection of that.

18        Q    Mm-hm.  Do you, did you ever discuss his

19   individual, his individual recruitment with any of the

20   other recruit officials?

21        A    His training?

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 81

1    what I receive or see.

2        Q    Okay.  So you don't, that's something that you

3    wouldn't see with the files?  You wouldn't see that?

4        A    No.

5        Q    Okay.

6            MR. COLLINS:  That's, that's my last question.

7            MR. JACKSON:  Just a couple of questions.

8                            EXAMINATION

9    BY MR. JACKSON:

10        Q    Lieutenant, during the course of the

11    investigation that was conducted by the Office of

12    Internal Affairs as it relates to Mr. Thompson, did you

13    provide them with a written statement?  .

14        A    No, not that I recall.

15        Q    Did you provide them with, with a verbal

16    statement?

17        A    No.  I have no recollection of that.

18        Q    Did you ever speak with anybody from the Office

19    of Internal Affairs?

20        A    No, not to the best of my recollection.

21        Q    And do you know whether or not anybody from the

DEPOSITION OF DAMION LAMONT TAYLOR
Conducted on January 23, 2008

Page 82

1    Office of Internal Affairs attempted in any way to

2    contact you?

3         A    Not to my knowledge.

4         Q    In your position at that time, Lieutenant, were

5    you authorized to discipline a Recruit Officer?

6         A    I was authorized to make recommendations for

7    discipline.

8         Q    But you, yourself, could not issue the

9    discipline; is that correct?

10        A    No.

11        Q    Did you ever discipline Mr. Thompson?

12        A    No.

13        Q    Thank you.

14             MR. JACKSON:  That's all that I have.

15             MR. COLLINS:  Nothing further.

16             MR. JACKSON:  Are you reading and signing, or

17   waiving?

18             THE WITNESS:  I'm not reading all that.

19             MR. JACKSON:  He'll waive it.

20             (Deposition ended at 5:58 p.m.)

21             E N D   O F   D E P O S I T I O N