## AFFIDAVIT OF TROY A. THOMPSON

**Comes now Your Affiant,** Troy A. Thompson, having been duly sworn under oath and hereby states as follows:

I am of sound mind and body.

1. I was hired with the Metropolitan Police Department (MPD) on August 25, 2003 as a police recruit. At that point, our class was introduced as 2003-4 and our class Sergeant was Sgt. Taylor. Our class Officer was Officer Hazelton. The Academy Lt. Was Lt. Hayes. The first 3 weeks into the Academy, Sgt. Taylor made a statement saying to one of the recruits "Do you know who your baby daddy is"? To me, I was offended by the remark and said something about it. His response was "I am an official and you're a recruit so don't you forget it".

2. Approximately September 2003 while I was in the academy, two female recruits from my class broke into the residential building after hours to steal the flag. They were caught and brought before Sgt. Taylor the next day, but he never wrote them up and they were not terminated, even though this is a critical violation under the Recruit Officer's Rules, Regulations and Policies, and in the Recruit Officers Handbook it states that if you break into any building, you would be terminated. However, these two females were not.

3. Approximately January 2004 a white male recruit from my class came to work reeking of alcohol. He confessed to Sgt. Taylor that he had been drinking the night before and supposedly it could still be on his breath and wasted on his clothes. Sgt. Taylor simply took his word for this, did not take police action to determine his blood alcohol count, etc. The recruit was simply allowed to miss class and sit it out in the library all day, returning to class per usual the next day.

1

Using or smelling of alcohol while on duty or in duty status is also a violation of the Recruit Officers Handbook. I asked Sgt. Taylor whether if this were to occur when I'm an officer, what should I do, since a drunk or drugged officer cannot be any help to either me if I'm his partner out on the streets, or to the citizens. His response to me was "Recruit Officer Thompson, don't make yourself a victim on this department".

4. A few days later my Physical Training instructor told Sgt. Petty that supposedly my eyes looked dilated. I told him my eyes are not dilated. I was then sent to the Police and Fire Clinic (PFC). Sgt. Roman took me so that I could be given a urine drug test. I passed this test all the way, as I had never taken any kind of drugs. The whole time I suspected that Sgt. Taylor was behind this. I continued in the Academy.

5. In February 2004, I was charged in Prince Georges County, Md. with phone harassment and at the same time a girl known by a friend of mine made a Petition for a Peace Order. A civil hearing was set before a judge. The petition for the peace order was found by the Court to be unsubstantiated and was denied and dismissed. During the hearing for this petition I was made aware by the court's bailiff that an official from the MPD Internal Affairs was seen in the courtroom taking notes. Eight days later, (March 16) the criminal phone harassment charge was also dismissed by the court before even being brought to trial because it too was without cause and was a lie. I immediately provided a copy of the actual dismissal document to Sgt. Taylor.

6. Two days later (March 18) Sgt. Taylor singled me out during a recitation of the Code of Ethics. He pulled me into the hallway outside of the classroom and began to scream at the top of his lungs at me, spitting in my face as he did so, causing me to retreat backwards. He stated, "You are a recruit and can be terminated for anything". Next he told me to take off "his" uniform and meet him in the cafeteria, so I went to my locker and changed clothes and went to the cafeteria to await further instructions.

7. Officer Hazelton came down to the cafeteria and told me to put my uniform back on and to wait for Sgt. Taylor in the front, so I did. When Sgt. Taylor came out front, he had a copy of the Recruit Officers Handbook where he had yellow highlighted certain sections and told me to write an "essay" about the sections he'd highlighted. He also handed me a blank PT-109 Form, though I had no idea why since it was blank. Next he said that Lt. Hayes wanted to see me so I went to his office. Lt. Hayes was aware of the prior problems I had encountered with Sgt. Taylor, so I explained to him what had occurred on this occasion. Lt. Hayes kept saying it was all a misunderstanding between the two of us.

8. I completed the "essay" and on the following Monday (March 22) Sgt. Taylor told me to again go to Lt. Hayes office. I did so, and Sgt. Taylor then arrived and closed the door. Lt. Hayes attitude had turned ugly. He started yelling and reminded me I was just a recruit and that I should do anything and everything I'm told, right or wrong, and that I should even stand there and let Sgt. Taylor spit in my face if need be. I could tell that this negative attitude had something to do with the content of the "essay". I simply responded that no disrespect intended,

but I am a human being, not a dog, and I also deserve respect and that deliberately spitting in my face was not respectful. I further explained to Lt. Hayes that I did stand there, while Sgt. Taylor spat on me and never said a word, just took a step back so that no more spit would get on me, so I was never disrespectful. Lt. Hayes threatened then that they were going to send me to the PFC to be revaluated for suitability by a Psychiatrist. This did not happen, but the threat was very scary wondering every day and worrying about it.

9. Lt. Hayes then told me to wait in the Library for further instructions. About 15 mins. later Sgt. Taylor arrived and told me to come to his office in 40 mins. When I did so, a Sgt. Powell was sitting there. Sgt. Powell started off by saying that he'd read my "essay" and it made me sound like a "girl", and that if he was a suspect he would "fuck you up", etc. I couldn't understand this because the "essay" was an academic exercise detailing the virtues of leadership and professionalism and in no way deserved this type of comment.

10. Next, Sgt. Taylor stated that he didn't want me in his class but that "I don't have a choice". He then told me that I really don't have any union rights and that the FOP can't help me because I'm a probationary officer, so "you can be terminated". He then stated that an administrative investigation takes place when criminal charges are made against a member of the MPD, even if the person charged is exonerated by the court and that he was talking to internal affairs. I asked if I could also talk to internal affairs. He stated, "No, I'm handling that". He then told me to go back to class.

11. On April 5, 2004, Sgt. Taylor gave me a letter (See Attachment A) stating that my probationary period was being extended as a result of the February charges and that I would not be graduating with my class on April 30, 2004. I asked him why when the charges had been dismissed almost 2 months prior and I had immediately provided him with court-issued documentation to prove this. He then reminded me that internal affairs still investigates. I reminded him that internal affairs had never contacted me about it and asked again if I could talk to them. He again replied "No".

12. In looking at the letter I noted that the General Order No. 201.7 that was quoted therein as the authority gave two circumstances that would allow them to extend my probation period. However, neither of these circumstances applied in my case because the entire time I had never been placed in a "non-pay status", nor at any time did I fail to perform the "full range of police duties of the position". My duties were to attend class and continue with all other Institute of Police Science academies and training. I remained in the academy and completed all academic requirements, satisfactorily passing all phases of training, without a break in service from the day I was hired in August 2003.

13. On April 15, 2004, Agent Moore of Internal Affairs began to harass my friend who had testified on my behalf at the February civil (peace order) hearing, repeatedly asking her to come in and give them a statement. This harassment continued until well into May. I remember wondering how she obtained this young lady's number because even at this point I never had talked to Agent Moore or any other person from internal affairs, as they had never contacted me

5

whatsoever and the young lady's number was not in my records. I do, however, remember giving it to Sgt. Taylor back in November 2003 during an emergency (accident) when he and I were on better terms. I suspect that he gave it to Agent Moore since he had already admitted to me that he was talking to internal affairs.

14. On April 16, 2004, Officer Hazelton came into our class during academic time and announced to the class that I had been charged with phone harassment, breaching her officer's code of ethics and my personal confidentiality. She never, however, added that these charges were unfounded and in fact were summarily dismissed. Officer Hazelton was not directly or indirectly involved in this and could only have found out about the charges via MPD officials – Sgt. Taylor, Lt. Hayes, Agent Moore.

15. On April 20, 2004, 10 days before my class was scheduled to graduate, I again reminded Sgt. Taylor that I had not been contacted by internal affairs whatsoever, and I felt that I should be allowed to graduate with my class on April 30. He stated "No". I was left in limbo.

16. My class graduated on April 30, without me. The Monday after my class graduated, (May 3) Lt. Hayes said for me to take a folder down to the PFC. When I looked at the front of the folder, it had my own name on it. I took it to the PFC and another recruit signed for it, but I was there. I realized that my folder was now just going down to the PFC in May, 3 months after the bogus phone harassment charge, and 2 months after the charge was dismissed and I was threatened with being reevaluated. This was also after my class had graduated just the Friday before, and I felt this was not a coincidence. If Sgt. Taylor and Lt.

Hayes felt that I needed revaluation, and they had <u>legitimate</u> concerns, you don't wait months to request a reevaluation if you really believe a recruit has psychological "issues", and if you are doing it for the right reasons. Why had these two waited until after my class graduated before making any kind of request in this regard? This had to be deliberate.

17. Around this same time I was assigned to the Property Division, away from the Training Academy.

18. May 4, 2004, was the first time I was ever contacted by Agent Moore. She ordered me to come to her office to give a statement regarding the February charge. I explained to her I did not know this person who made the bogus charge, but that my friend knew her as was stated during the petition for peace order hearing back in February, where Agent Moore's internal affairs colleague was present taking notes.

19. Approximately 2 weeks later, Agent Moore called me back into her office and introduced a new topic, which was my MPD Blue Background Booklet completed in January 2003. She accused me of having lied on this booklet. I asked her what was she talking about, that I had not lied about anything. She alleged that I had told the Prince Georges County, (Maryland) Police (PGCP) back in 2001 when I applied with them that I had smoked marijuana and had sold drugs but did not state this on the MPD Blue Booklet. I responded that this is not true and that I had never ever smoked marijuana or sold drugs nor did I tell this to PGCP.

20. It seems that in their desperation to gemmy up something on me, Agent Moore had read my Blue Background Booklet, which I filled out in January 2003 as part

7

of the pre-employment process with MPD. She saw that I had answered a question therein, which asked something on the order of if you had ever applied for a position with any other Government agency. I had responded, "Yes" because in 2001 I had applied with the Prince Georges County Police Department (PGCP). She claimed she had compared the Background Book I filled out for PGCP and the one filled out for MPD and determined that I had lied to MPD because I had allegedly told PGCP that I use to smoke marijuana and sold drugs but did not tell MPD this. I challenged her on this.

21. The background on this - - as I stated above, I had made prior application to PGCP in 2001 and similar type question had been asked in their Blue Background Book, using the words "experimenting with drugs" and this meaning was unclear. I asked for guidance of the PGCP recruiter. I explained to him that I had never smoked, used or sold illegal drugs of any kind, but that during high school I had been around others who did so, yet never in the company of these individuals at the time they were doing so. The PGCP recruiter stated that this constituted second hand smoking, even though I never smoked it directly, or even ever put it to my lips. It's the contact of it, he said. He also asked how long ago this was, and I indicated that it was back when I was in the 11th Grade, at least 9 years prior. He then asked me about how many times I had been around it. I felt it might be about 9 times, maybe. He told me to put down "9 times" and then explain it to my investigator when he or she contacts me. I complied.

22. There was another question that came up in the 2001 PGCP up asking whether you knew of anyone that may have sold illegal drugs. I raised my hand again.

8

The same recruiter came over. I explained that I was with some who had the reputation for selling marijuana when I was in high school. He asked me how much did I think they made? I told him from what the hearsay was that they told me $20,000. He then said that well if they would have gotten pulled over and the Police would have found the marijuana, then I could have been charged with possession and he told me to put that in the booklet. I reminded him that I never sold any drugs, whatsoever, and that these were acquaintances that I was speaking of. Also, there was much hearsay and gossip about drugs and alleged dealers in just about every high school in those days. He stated that all could have been charged and again told me to put this down and then explain it to the investigator. I complied.

23. Fast-forwarding to January 2003, when I applied to the MPD, I explained all of this to my MPD recruiter. She stated that PGCP recruiter was wrong because in answering in the manner to which I had been directed by the PGCP recruiter would give a false and erroneous impression that I had done these things personally. She said that's not the same and is not the intent of the question(s) as asked on the MPD Blue Background Booklet. "Experiment" means have "you, personally" tried or used drugs. I answered her with a truthful "No"! She responded then the answer to be provided in the MPD booklet would be "No".

24. She stated that I had explained both situations to her and that where the Blue Booklet asks whether I have applied to any other agency, to respond, "Yes". She said to put in there the agency as the Prince Georges County Police, and she would look into it. I complied.

9

25. My MPD investigator checked this and everything else in the Blue Booklet. I passed all of this scrutiny and the investigator found that I was telling the truth as answered in the MPD Blue Booklet.

26. I also related to Agent Moore how the questions asked by PGCP were not phrased the same as MPD and that I answered the questions as presented. I also related to her that the PGCP recruiter had misguided me in his misinterpretation, or misrepresentation as stated by the MPD recruiter and that his interpretation was wrong as "experimenting with drugs" means "have you personally ever experimented". Again, I answered the MPD Blue Booklet truthfully, as presented. I also restated that I had never, ever sold drugs and that during the full investigation of my background there has never been any reason or evidence to even suggest that I ever did. Agent Moore then stated that if there were anything else, she would call me back in.

27. Following this meeting, both Agent Moore and Investigator Robinson (the woman I later found out was the one in the courtroom taking notes back in February) immediately sped to Bethesda, Md. where unannounced, and unwelcome, they confronted my friend at her place of employment – even though Agent Moore had been strictly told by the young lady not to come to her employment as that might jeopardize her job. She reminded Agent Moore that she had deliberately placed her livelihood in jeopardy and that her boss did not appreciate this. The young lady stated to me that she realized that Agent Moore was determined to dog her until she talked to them. Therefore, in order to stop the harassment, she went outside and spoke to them, answering all of their questions.

28. Agent Moore tried repeatedly to get the young lady to recant her statements made back in March at the peace order hearing, and to change all of her prior statements, which Investigator Robinson had sat in the courtroom and made notes about. Agent Moore threatened the young lady that she would bring her up on some bogus charges if she did not do so. The young lady refused to change her statements and stated that all that she had to add to the matter was stated in open court in March and was heard by Investigator Robinson, anyway. After more attempts at intimidation the young lady had to get back to work and did so.

29. I heard nothing more on this until approximately 2 months later when I was handed a letter of termination of my probationary position on July 6, to be effective 3 days later, July 9 (See Attachment B). This letter did not state why I was being terminated, did not provide any instructions for how to close out or separate, how to apply for continuance of health insurance, etc.

30. After many calls to Human Resources, FOP, etc. no one would inform me of specifically why I was being terminated, who to see regarding OHR protections, or how to go about preserving any rights I might have, under law.

31. I finally learned on July 8 that I had to contact Jacqueline Johnson, the MPD EEO Officer before I could even file an OHR complaint. I spoke with Ms. Johnson briefly over the phone and asked her to please find out the alleged reason for my termination because I didn't even know what I would be responding to at the OHR. She asked me to come in at 3:00 PM that same day, where I thought she was going to inform me of the alleged reasons and then get my statement, at least, about these reasons. Instead, when I arrived at her office, I was informed that she

11

wanted me to come down to another floor in the same building (that I soon found out was occupied by internal affairs). She met me in the waiting area of internal affairs and she handed me a letter stating she had conducted a review and supported the MPD actions (See Attachment C). I hardly think a fair, objective or impartial investigation was done in a matter of 2 – 3 hours, especially when Ms. Johnson never asked me my side nor took any statement from me whatsoever in response to the alleged reasons, which at this point I still did not know.

32. I again asked her what were the reasons given for my termination. She stated that internal affairs said (1) phone harassment (2) threats with a gun (3) falsifying my application. I informed her that none of this is true and that reason #2 was being heard of for the first time and had never been raised before. She stated that to save this for OHR as they are supposed to do an investigation. With this, she dismissed my responses.

33. I am also aware of an incident in which three police recruits were involved in a public drunken brawl at the Brass Monkey Restaurant and Bar in Adams Morgan, Washington, D.C., yet although these are grounds for immediate termination, none of these recruits were terminated.

34. I am also aware of a recruit who was charged with domestic abuse (assault) where termination was not the disposition in this case.

35. I filed my complaint with the Office of Human Rights in July 2004. An intake interview was held in September 2004 and my formal complaint was accepted. A copy of the complaint is attached (See Attachment **D**).

FURTHER AFFIANT SAYETH NAUGHT

Respectfully submitted,

_____
Troy A. Thompson

DISTRICT OF MARYLAND, ss:

Subscribed and sworn to before me, a Notary Public in and for the District aforesaid, this 5th day of May, 2005.

My commission expires: 5/22/07



DEBBORAH T. BRITT
NOTARY PUBLIC
CHARLES COUNTY
MARYLAND
MY COMMISSION EXPIRES MAY 22, 2007

13